_____

No. 94-3609
_____

Myrisia Franklin,                    *
                                     *
            Petitioner,       *
                                     *    Petition for Review of an Order
    v.                               *    of  the  Board  of  Immigration
                                     *    Appeals.
Immigration and Naturalization  *
Service,                             *
                                     *
            Respondent.       *
                    _____

              Submitted:  April 12, 1995

              Filed:  December 11, 1995
                    _____

Before FAGG and BOWMAN, Circuit Judges, and BENNETT,* District
      Judge.
                    _____

FAGG, Circuit Judge.


    Myrisia Franklin, a Philippine citizen, was convicted of recklessly
causing the death of her child, a crime classified as involuntary
manslaughter under Mo. Rev. Stat. § 565.024.1(1) (Supp. 1994).   Under
Missouri law, persons act recklessly when they "consciously disregard[] a
substantial and unjustifiable risk that circumstances exist or that a
result will follow, and [the] disregard constitutes a gross deviation from
the standard of care [that] a reasonable person would exercise in the
situation."  Mo. Rev. Stat. § 562.016.4 (Supp. 1994).  Following Franklin's
conviction, the Immigration and Naturalization Service brought deportation
proceedings against Franklin under 8 U.S.C. §

    *The HONORABLE MARK W. BENNETT, United States
    District Judge for the Northern District of Iowa,
    sitting by designation.

1251(a)(2)(A)(i) (1994), which permits the deportation of an alien who is convicted of a "crime involving moral turpitude."  After a hearing, an immigration judge (IJ) decided Franklin's crime involves moral turpitude and ordered Franklin deported.  The Board of Immigration Appeals (BIA) affirmed the IJ's decision.  Contending she was not convicted of a crime involving moral turpitude, Franklin petitions for review.

Whether a statute defines a crime that involves moral turpitude for deportation under § 1251(a)(2)(A)(i) is a question of federal law.  Cabral v. INS, 15 F.3d 193, 196 n.5 (1st Cir. 1994).  Like the BIA, we look to state law to determine the elements of the crime.  Id.  Otherwise, the consequences a state chooses to place on the conviction in its own courts under its own laws cannot control the consequences given to the conviction in a federal deportation proceeding.  Yazdchi v. INS, 878 F.2d 166, 167 (5th Cir.) (per curiam), cert. denied, 493 U.S. 978 (1989).  Contrary to Franklin's view, we do not examine the factual circumstances surrounding her crime.  Castle v. INS, 541 F.2d 1064, 1066 (4th Cir. 1976) (per curiam).  Thus, on de novo review we must decide whether the BIA has reasonably interpreted its statutory mandate to deport aliens convicted of crimes involving moral turpitude.  See Chevron U.S.A. Inc. v. Natural Resources Defense Counsel, Inc., 467 U.S. 837, 842-44 (1984); Arkansas AFL-CIO v. FCC, 11 F.3d 1430, 1440-41 (8th Cir. 1993) (en banc).  If the BIA's interpretation is reasonable, "[we] cannot replace the agency's judgment with [our] own."  Arkansas AFL-CIO, 11 F.3d at 1441.

The Immigration and Nationality Act, 8 U.S.C. §§ 1101-1524 (1994), does not define the phrase "crime involving moral turpitude" and the Act's legislative history does not shed any light on Congress's intent.  Cabral, 15 F.3d at 195.  So "Congress left the [phrase] to future administrative and judicial interpretation."  Id.  In filling this gap, the BIA decided years ago that when criminally reckless conduct requires a conscious

disregard of a substantial and unjustifiable risk to the life or safety of others, although no harm was intended, the crime involves moral turpitude for immigration purposes. In re Medina, 15 I. & N. Dec. 611, 613-14 (BIA 1976), aff'd sub nom. Medina-Luna v. INS, No. 76-1498, slip op. at 2 (7th Cir. Jan. 13, 1977) (unpublished opinion); In re Wojtkow, 18 I. & N. Dec. 111, 112-13 (BIA 1981). Having consistently adhered to its view about crimes of reckless endangerment for nearly twenty years, the BIA's interpretation is entitled to deference. See Arkansas AFL-CIO, 11 F.3d at 1441; Okoroha v. INS, 715 F.2d 380, 382 (8th Cir. 1983). Because the Missouri definition of recklessness is nearly identical to the definitions in Medina and Wojtkow, the BIA applied the same interpretation in Franklin's case.

Although Franklin argued for a bright-line rule that involuntary manslaughter convictions do not involve moral turpitude, the BIA rejected her approach as unworkable in light of "the myriad [of] state classifications" for the crime. In re Franklin, No. A-40191863, 1994 WL 520990 (BIA Sept. 13, 1994). The BIA decided that it "must analyze the specific statute under which the alien [is] convicted on a case-by-case basis . . . to determine whether the conviction is for a crime involving moral turpitude." Id. After considering the Missouri statute under which Franklin was convicted as well as the relevant definition of recklessness, the BIA concluded that because Franklin's crime "requires that she acted with a `conscious disregard of a substantial and unjustifiable risk,' . . . she has been convicted of a crime involving moral turpitude." Id. (quoting Mo. Rev. Stat. § 562.016.4 (Supp. 1994)).

Mindful that moral turpitude is a nebulous concept and there is ample room for differing definitions of the term, 3 Charles Gordon & Stanley Mailman, Immigration Law and Procedure § 71.05[1][d], at 71-146 to 71-149 (1994), we cannot say the BIA's interpretation is unreasonable. Indeed, two other federal circuits

have accepted the BIA's finding of moral turpitude in criminally reckless conduct that is defined as the conscious disregard of a substantial and unjustifiable risk. Gutierrez-Chavez v. INS, No. 92-70104, 1993 WL 394916, at *2-5 (9th Cir. Oct. 6, 1993) (unpublished opinion); Medina-Luna v. INS, No. 76-1498, slip op. at 2 (7th Cir. Jan. 13, 1977) (unpublished opinion). We believe deference to the BIA's view is particularly appropriate because applying the moral turpitude term in the context of the immigration laws entails "policy determinations [about deportation] that fall within the ambit of [the BIA's] expertise." Akindemowo v. INS, 61 F.3d 282, 285 (4th Cir. 1995).

In the framework of our deferential review, we cannot say the BIA has gone beyond the bounds of reasonableness in finding that an alien who recklessly causes the death of her child by consciously disregarding a substantial and unjustifiable risk to life has committed a crime that involves moral turpitude. Under the BIA's longstanding definition of moral turpitude, Franklin's crime can be fairly characterized as "`"an act of baseness, vileness, or depravity in the private and social duties which [persons] owe to [their] fellow [persons] or to society in general, [and is] contrary to the accepted and customary rule of right and duty between [persons]."'" Marciano v. INS, 450 F.2d 1022, 1025 (8th Cir. 1971) (quoted cases omitted), cert. denied, 405 U.S. 997 (1972).

We deny Franklin's petition for review.

BENNETT, District Judge, dissenting.

The deportation of Myrisia Franklin to the Philippines would be a miscarriage of justice. Before explaining why, I offer two observations based on extensive examination of deportation cases. First, such cases all too often receive from the BIA consideration that is both cursory and superficial. Second, the BIA often

-4-

receives from the courts more deferential review than it is due.  There are admittedly deportation cases that may be decided by the BIA with relative ease and dispatched with brevity.  This is not such a case.  The BIA must resist the temptation to dismiss deportation cases as treading all-too-familiar ground.  Hiding in the apparently familiar landscape may be an issue that should send triers of fact and law up roads less travelled.  This is such a case and compels such a journey.  Because I conclude that neither the majority here nor the BIA below has applied the proper standards to determining whether Myrisia Franklin has been convicted of a crime involving moral turpitude, and hence is deportable, I dissent.

I have three principal disagreements with the decisions in this case.  First, I dissent from according the BIA deferential review of each of its determinations in this case.  Second, I dissent from the view that criminal recklessness can be a sufficient mental state to make a crime one in which moral turpitude necessarily inheres.  Third, even if criminal recklessness could be deemed sufficient as that state of mind is sometimes defined, I find that neither the majority nor the BIA properly considered Missouri's definition of the crime of which Myrisia Franklin was convicted in deciding that such a crime was one in which moral turpitude necessarily inheres.  At bottom, I must conclude that involuntary manslaughter as defined under Missouri law simply is not a "crime involving moral turpitude," subjecting an alien to deportation under § 241(a)(2)(A) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1251(a)(2)(A).  Involuntary manslaughter has not been so viewed in more than two centuries of this country's common law; the BIA's decision below offers no reasoned basis for disregarding the exclusion of involuntary manslaughter from the realm of crimes involving moral turpitude in the common law and the BIA's own prior decisions; involuntary manslaughter does not, as typically defined, involve the characteristic elements of a "crime involving moral turpitude";

and involuntary manslaughter certainly does not involve those characteristic elements as the crime is defined under Missouri law.

## I. THE GRAVITY OF DEPORTATION

However, before I turn to these specific disagreements with the majority, I must first stress the gravity of the issue before the court. As the Supreme Court has emphasized on more than one occasion,

> "deportation is a drastic measure and at times the equivalent of banishment or exile, Delgadillo v. Carmichael, 332 U.S. 388 [(1947)]. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision [former § 241(a)(4), now § 241(a)(2)(A)] less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on [the alien's] freedom beyond that which is required by the narrowest of several possible meanings of the words used."

Costello v. INS, 376 U.S. 120, 128 (1964) (quoting Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948)); Rosenberg v. Fleuti, 374 U.S. 449, 458 (1963) ("the 'interests at stake' for the resident alien are 'momentous,'" citing Delgadillo v. Carmichael, 332 U.S. 388, 391 (1947), and DiPasquale v. Karnuth, 158 F.2d 878, 879 (2d Cir. 1947)); Jordan v. DeGeorge, 341 U.S. 223, 231 (1951) (also quoting Fong Haw Tan); Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948); Delgadillo v. Carmichael, 332 U.S. 388, 391 (1947) ("[t]he stakes are indeed high and momentous for the alien who has acquired his residence here."); Okoroha v. INS, 715 F.2d 380, 382 (8th Cir. 1983) ("We are mindful that deportation is a harsh remedy," citing Costello).[1]

_____

[1]By focusing on the gravity of deportation decisions, I do not mean to suggest that Congress does not have the power to control immigration and deportation:

> Judge Learned Hand, speaking for the United States Court of Appeals for the Second

Circuit, in United States ex rel. Kaloudis v. Shaughnessy, 180 F.2d 489, 490 [(2d Cir. 1950)], said:

> "The interest which an alien has in continued residence in this country is protected only so far as

The stakes in the present case are undeniably high.

> Congress may choose to protect it;
> Congress may direct that all shall
> go back, or that some shall go back
> and some may stay; and it may
> distinguish between the two by such
> tests as it thinks appropriate."
>
> Aliens, so long as they are permitted to remain in the United States, are entitled to the protection of its Constitution and laws with respect to their rights of person and of property and to their civil and criminal responsibility. "But they continue to be aliens, * * * and therefore remain subject to the power of Congress to expel them, or to order them to be removed and deported from the country, whenever, in its judgment, their removal is necessary or expedient for the public interest." Fong Yue Ting v. United States, 149 U.S. 698, 724, 13 S. Ct. 1016, 1026, 37 L. Ed. 905.

United States ex rel. De Luca v. O'Rourke, 213 F.2d 759, 763 (8th Cir. 1954). This recognition of congressional power to control immigration and deportation, however, does not undermine the gravity of the individual deportation decision nor entitle the BIA or the INS to make unreasonable deportation decisions.

Furthermore, the BIA has held, and the courts have agreed, that for a crime to fit within the meaning of the statute that provides for deportation of aliens convicted of "crimes involving moral turpitude," the alien must have been convicted of a crime that <u>necessarily</u> and <u>inherently</u> involves moral turpitude. <u>Goldeshtein v. INS</u>, 8 F.3d 645, 647 (9th Cir. 1993); <u>United States v. Chu Kong Yin</u>, 935 F.2d 990, 1003 (9th Cir. 1991); <u>Wadman v. INS</u>, 329 F.2d 812, 814 (9th Cir. 1964); <u>Tseung Chu v. Cornell</u>, 247 F.2d 929, 935 (9th Cir.), <u>cert. denied</u>, 355 U.S. 892 (1957); <u>Ablett v. Brownell</u>, 240 F.2d 625 (D.C. Cir. 1957); <u>United States ex rel. Giglio v. Neelly</u>, 208 F.2d 337 (7th Cir. 1953); <u>United States ex rel. Guarino v. Uhl</u>, 107 F.2d 399 (2d Cir. 1929). This case therefore involves both serious consequences for the alien and stringent requirements

for the kind of criminal conduct on the part of the alien that can incur those consequences.

## II.  STANDARD OF REVIEW

Because I take issue with both the INS's and the majority's disposition of this case, it is of critical importance that I first establish the proper standard of review by this court of the agency's determination.  On this question, I find that the majority has failed to appreciate what I believe to be a split in the circuits over what standard of review is applicable, or has extended deferential review of the INS's interpretation of "moral turpitude" in this case beyond its proper bounds. This may be attributable to a more general failure among the circuit courts of appeals to appreciate fully that the BIA's determinations in deportation cases such as this involve interpretations of both federal and state law. When the BIA considers whether an alien should be deported pursuant to § 241(a)(2)(A), 8 U.S.C. § 1251(a)(2)(A), following the alien's conviction of a state crime, the definition of "crime involving moral turpitude" under this section of the INA is a matter of federal law.  See, e.g., Cabral v. INS, 15 F.3d 193, 196 n.5 (1st Cir. 1994).  However, the elements and nature of the crime of which the alien has been convicted are matters of state law.  See, e.g., Gonzalez-Alvarado v. INS, 39 F.3d 245, 246 n.2 (9th Cir. 1994); Cabral, 15 F.3d at 196 n.5 (citing In re H, 7 I. & N. Dec. 359, 360 (BIA 1956)).

### A.  "Reasonableness" Or "De Novo" Review?

Following a road well travelled, but rarely scrutinized, the majority has applied the standard of review for agency interpretations of statutes the agency is charged with implementing, citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). Pursuant to this standard of review, when a court is confronted with an instance in which neither Congress nor the statute in question provides guidance to the court for resolution of the correct interpretation

of terms of the statute, the court may not automatically impose its own interpretation of the statute; instead, the court must apply the interpretation of the agency charged with implementing the statute, provided the agency's interpretation "is based on a permissible construction of the statute." Chevron, 467 U.S. at 843; see also Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696-97 (1991); Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 87 (1975); Udall v. Tallman, 380 U.S. 1, 16-18 (1965); Akindemowo v. INS, ___ F.3d ___, ___, 1995 WL 470544, *2 (4th Cir. 1995); and compare Mendoza v. INS, 16 F.3d 335, 337 (9th Cir. 1994) (applying deferential review required by Chevron even though language of statute was plain and intent of Congress was therefore clear). Under Chevron, courts must accord the agency's interpretation considerable deference, and "'should not disturb [that interpretation] unless it appears from the statute or the legislative history that the accommodation is not one that Congress would have sanctioned.'" Chevron, 467 U.S. at 845 (quoting United States v. Shimer, 367 U.S. 374, 383 (1961)); Akindemowo, ___ F.3d at ___, 1995 WL 470544, at *2. Thus, the court will defer to the agency's interpretation if it is "rational and consistent with the statute." NLRB v. United Food & Commercial Workers Union, Local 23, AFL-CIO, 484 U.S. 112, 123 (1987); Chevron, 467 U.S. at 442-44 (describing the review as a determination of whether the agency's interpretation is "reasonable"); Akindemowo, ___ F.3d at ___, 1995 WL 470544, at *2 (recognizing split in circuits over reasonableness of INS's interpretation of "single scheme of criminal misconduct" in § 241(a)(2)(A)(ii), 8 U.S.C. § 1251(a)(2)(A)(ii)); Arkansas AFL-CIO v. FCC, 11 F.3d 1430, 1440-41 (8th Cir. 1993)(en banc) ("reasonableness" is standard of review, and if the agency's interpretation is "reasonable," the court "cannot replace the agency's judgment with [its] own.").

The INS argued for this standard of review in this case, citing Cabral v. INS, 15 F.3d 193, 194-95 (1st Cir. 1994). In explaining what is required to overturn the INS's interpretation of

a deportation statute under <u>Chevron's</u> "reasonableness" standard, the First Circuit Court of Appeals in <u>Cabral</u> held that "the interpretation given by the BIA is entitled to deference unless arbitrary, capricious, or manifestly contrary to the statute."  <u>Cabral v. INS</u>, 15 F.3d at 194; <u>see also</u> <u>Mosquera-Perez v. INS</u>, 3 F.3d 553, 555 (1st Cir. 1993); <u>Alvares-Flores v. INS</u>, 909 F.2d 1, 3 (1st Cir. 1990) (rejecting a pure de novo review because Congress left gaps in the statute to agency interpretation).  The <u>Cabral</u> court observed that although this standard is high, the court remains the final authority in matters of statutory interpretation and "'must reject administrative constructions which are contrary to clear congressional intent.'"  <u>Cabral</u>, 15 F.3d at 194 (quoting <u>Mosquera-Perez</u>, 3 F.3d at 555, in turn quoting <u>Chevron</u>, 467 U.S. at 843 n.9).

The reasonableness of the agency's interpretation, under this standard of review, may be evidenced by the "reasoning process the [INS or BIA] followed in deciding where along the spectrum of possibilities" the proper definition of a statutory standard lies.  <u>See</u> <u>Jaramillo v. INS</u>, 1 F.3d 1149, 1154 (11th Cir. 1993) (en banc).  The INS or the BIA has acted arbitrarily or capriciously if it "made a decision without a rational explanation, departed inexplicably from an established policy, or discriminated invidiously against a particular race or group."  <u>Varela-Blanco v. INS</u>, 18 F.3d 584, 587 (8th Cir. 1994) (citing <u>Rodriguez-Rivera v. INS</u>, 993 F.2d 169, 170 (8th Cir. 1993) (per curiam), for this standard in reviewing INS decision for abuse of discretion); <u>Rodriguez-Rivera</u>, 993 F.2d at 170 (also review of asserted abuse of discretion); <u>see also</u> <u>Mahini v. INS</u>, 779 F.2d 1419, 1420 (9th Cir. 1986) (where review of agency action was for reasonableness, court looked to agency's adherence to its own prior rulings).

This standard of review was described in <u>Cabral</u> as "review <u>de novo</u>, according due deference to the BIA's interpretation of the deportation statute," <u>see</u> <u>Cabral</u>, 15 F.3d at 194; <u>Mosquera-Perez</u>,

3 F.3d at 554; Perlera-Escobar v. INS, 894 F.2d 1292, 1296 (11th Cir. 1990), but it is plain to me that where this court cannot come to its own, independent interpretation of state law, review is not de novo in any real sense.  See Salve Regina College v. Russell, 499 U.S. 225, 237-38 (1991) (finding that difference between deferential review and independent de novo review is that on independent review, the appellate court may reverse where it "would resolve an unsettled question of state law differently from the district court's resolution, but cannot conclude that the district court's determination constitutes clear error," and holding that "[w]hen de novo review is compelled, no form of appellate deference is acceptable.").

Furthermore, the "de novo with deference" review in Cabral was based in part on the Supreme Court's stated standard for review of an INS interpretation of a statutory standard stated in INS v. Jong Ha Wang, 450 U.S. 139 (1981) (per curiam), a pre-Chevron case.  Cabral, 15 F.3d at 194. However, Jong Ha Wang did not involve judicial review of the INS's interpretation of a purely statutory standard, but review of the INS's interpretation of a matter specifically consigned by statute to the INS's discretion.  Jong Ha Wang, 450 U.S. at 145 (INS makes discretionary determination under § 244, 8 U.S.C. § 1254(a)(1), of whether "extreme hardship" should prevent deportation).  Deference is obviously appropriate when the matter is consigned to the INS's discretion in the first place; but that is not so here.  The INS may well be charged with implementing the provisions for deportation for conviction of a "crime involving moral turpitude," but the INS is not granted any discretion under § 241(a)(2)(A), 8 U.S.C. § 1251(a)(2)(A), in deciding whether a particular crime is one involving moral turpitude.

Finally, the Cabral court's principal authority for this standard of review, Mosquera-Perez, also did not involve review of a comparable issue. Although Mosquera-Perez did not involve review of a matter in the INS's discretion originally, nonetheless it

-12-

involved review of a statutory construction of another provision of the immigration acts, § 243(h)(2)(B), 8 U.S.C. § 1253(h)(2)(B), concerning the question of whether an aggravated felony conviction constitutes an absolute bar to withholding deportation under that section.  Mosquera-Perez, 3 F.3d at 554.  Thus, the statute in question in Mosquera-Perez involved a purely federal question, i.e., construction of a federal statute by the federal agency charged with implementing that statute.  No part of the meaning of the federal statutory standard nor its application in Mosquera-Perez concerned the definition of a crime under state law.

I agree that a deferential review is appropriate in INS cases that properly fall within the parameters of a Chevron review.  See Jaramillo, 1 F.3d at 1153 ("The Chevron rule of deference is fully applicable to the immigration area," citing Jong Ha Wang as applying a similar standard of review in a pre-Chevron case).  Deference is appropriate when the INS is granted discretion to decide a particular matter.  For example, the INS is entitled to deferential review of its discretionary determination of whether or not an alien's circumstances entitle the alien to relief from deportation under a statutory standard.  See Jong Ha Wang, 450 U.S. at 145 (deferential review of INS's discretionary determination under then § 244, 8 U.S.C. § 1254(a)(1), of whether "extreme hardship" should prevent deportation); Jaramillo, 1 F.3d at 1152-53 (another case cited for this deferential standard by the court in Cabral, but again involving the review of the INS's discretionary denial of relief from deportation, this time under current § 212(c), 8 U.S.C. § 1182(c), which involved the question of when the period of lawful unrelinquished domicile by the alien ended).[2]  Second, the INS is entitled to deference when it considers the

---

[2]In Jaramillo, the Eleventh Circuit Court of Appeals noted that where the INS had been delegated discretionary authority to construe the meaning of a statute, they could do so narrowly should they deem it wise to do so for policy reasons.  Jaramillo, 1 F.3d at 1153 (citing Jong Ha Wang, 450 U.S. at 144).

meaning of terms in the statute it is charged with interpreting. <u>Mosquera-Perez</u>, 3 F.3d at 554 (deferential review of whether conviction of an aggravated felony is an absolute bar to withholding of deportation under § 1253(h)(2)(B)). This is also a <u>Chevron</u> matter, and the meaning of the terms depends upon legislative history and federal agency and judicial interpretation. Similarly, I would find the deferential standard of review was appropriate as applied in <u>Mendoza v. INS</u>, 16 F.3d 335, 336 (9th Cir. 1994), which considered the deportability of an alien depending on the meaning of "entry" in 8 U.S.C. § 1101(a)(13) and 8 U.S.C. § 1251(a)(2)(A)(i), because the meaning of the term at issue was exclusively a matter of federal law.

In the present case, I agree that this deferential standard of review is applicable to the INS's, or BIA's, resolution of one of the key questions with which it was presented, the proper <u>definition</u> of "crime involving moral turpitude" under § 241(a)(2)(A), 8 U.S.C. § 1251(a)(2)(A). The meaning of the phrase is a matter of federal law, based on Congressional intent so far as such intent can be perceived from the language of the statute or its legislative history, and, in the absence of such guidance, the meaning of the phrase is a matter for federal agency and federal judicial construction. <u>See</u> <u>Chevron</u>, 467 U.S. at 843; <u>Cabral</u>, 15 F.3d at 196 n.5 (citing <u>Babouris v. Esperdy</u>, 269 F.2d 621, 623 (2d Cir. 1959), <u>cert. denied</u>, 362 U.S. 913 (1960); <u>Burr v. INS</u>, 350 F.2d 87, 90 (9th Cir. 1965), <u>cert. denied</u>, 383 U.S. 915 (1966)).[3]

By contrast, the Ninth Circuit Court of Appeals has held that whether or not a state statute defines a crime that necessarily

---

[3]Even applying this deferential standard of review to the INS's definition of "crime involving moral turpitude," however, I find the INS's construction of the standard, which encompasses crimes that may involve only criminally reckless conduct, to be unreasonable.

involves moral turpitude for the purposes of the deportation provisions of § 241(a)(2)(A), 8 U.S.C. § 1251(a)(2)(A), is a question of law reviewed de novo, in the pure sense of that phrase—that is, without any deference to the decision below. See, e.g., Rodriguez-Herrera v. INS, 52 F.3d 238, 240 n.4 (9th Cir. 1995); Gonzalez-Alvarado v. INS, 39 F.3d 245, 246 (9th Cir. 1994); Goldeshtein v. INS, 8 F.3d 645, 647 n.4 (9th Cir. 1993); De La Cruz v. INS, 951 F.2d 226, 228 (1991) (per curiam); United States v. Chu Kong Yin, 935 F.2d 990, 1003-04 (9th Cir. 1991); McNaughton v. INS, 612 F.2d 457, 459 (9th Cir. 1980) (per curiam); Winestock v. INS, 576 F.2d 234, 235 (9th Cir. 1978); Guerrero de Nodahl v. INS, 407 F.2d 1405, 1406-07 (9th Cir. 1969). Indeed, these decisions do not make any mention in these circumstances of any deference to be accorded the agency's determination. Thus, I perceive a split of authority, or, at least, a fundamental difference in approach to or perception of the issue, in appellate reviews of INS cases. Compare Cabral, 15 F.3d at 194 (review of BIA's determination that alien has been convicted of a crime involving moral turpitude is reviewed under Chevron standards); with Rodriguez-Herrera, 52 F.3d at 240 n.4 (review of BIA's determination of whether or not a crime defined by state law is one involving moral turpitude is de novo). I explain that split as the result of the appellate courts either making or failing to make a distinction between construction of a federal statute by the agency charged with its implementation, on the one hand, and application of the federal statute so construed to a particular crime defined by state law, which involves construction of the state law as well, on the other hand. The Ninth Circuit Court of Appeals regards this latter situation as involving a question of law reviewed without any deference to the agency's conclusions. Indeed, in the Ninth Circuit Court of Appeals cases cited above, the reviewing court did not even consider the "reasonableness" of the INS's definition of "crime involving moral turpitude." The court instead considered only whether the INS erred as a matter of law in concluding that the crime defined by state law was one that involved the essential

-15-

elements of a crime involving moral turpitude as the INS, the BIA, and the federal courts had defined "crime involving moral turpitude."

Thus, when we turn to the question of the application of the INS's definition of "crime involving moral turpitude" to a crime as defined by state law, I do not believe that the INS is entitled to any deference at all. I can see no difference, for purposes of the appropriate standard of appellate review, between the INS's interpretation of state law defining a criminal offense, when the INS tries to determine whether a crime of the nature defined by that state law necessarily involves moral turpitude, and interpretation of state law by a federal district court. Although the former was reviewed deferentially until 1991, in this and a majority of other circuits, see, e.g., Parmenter v. FDIC, 925 F.2d 1088, 1092 (8th Cir. 1991) ("[W]e defer to the district court's interpretation of applicable state law," citing Economy Fire & Cas. Co. v. Tri-State Ins. Co. of Minnesota, 827 F.2d 373, 375 (8th Cir. 1987)); Ackley State Bank v. Thielke, 920 F.2d 521, 524 (8th Cir. 1990) ("We give substantial weight to district judges and bankruptcy judges in interpreting state law," citing Grenz Super Valu v. Fix, 566 F.2d 614, 615 (8th Cir. 1977)); Norton v. St. Paul Fire & Marine Ins. Co., 902 F.2d 1355, 1357 (8th Cir. 1990) ("In general, we accord substantial deference to a district court's interpretation of the law of the state in which it sits."), that is no longer the case. See, e.g., Michalski v. Bank of Am. Arizona, ___ F.3d. ___, ___, 1995 WL 581346, *2 (8th Cir. Oct. 5, 1995) ("[T]he district court's interpretation of Minnesota law is . . . subject to de novo review."); Damron v. Herzog, ___ F.3d ___, ___, 1995 WL 571865, *2 (8th Cir. Sept. 26, 1995) ("We review de novo the district court's interpretation of state law."); Ventura v. Titan Sports, Inc., 65 F.3d 725, 729 (8th Cir. 1995) ("[w]e review the district court's interpretation of Minnesota law de novo."); Kostelec v. State Farm Fire & Cas. Co., 64 F.3d 1220, 1225 (8th Cir. 1995) ("Of course, we review the district court's

interpretation of state law de novo.").

The reason for the change in the standard of appellate review of district court interpretations of state law is that, in 1991, the United States Supreme Court decided Salve Regina College v. Russell, 499 U.S. 225 (1991). In Salve Regina College, the Court rejected the rule of deference embraced by the majority of the circuit courts of appeals. Salve Regina College, 499 U.S. at 231. The Court concluded first that "[t]he obligation of responsible appellate jurisdiction implies the requisite authority to review independently a lower court's determinations. Independent appellate review of legal issues best serves the dual goals of doctrinal coherence and economy of judicial administration." Id. The court recognized that the function of the district courts is different from that of the appellate courts:

> District judges preside over fast-paced trials: Of necessity they devote much of their energy and resources to hearing witnesses and reviewing evidence. Similarly, the logistical burdens of trial advocacy limit the extent to which trial counsel is able to supplement the district judge's legal research with memoranda and briefs. Thus, trial judges often must resolve complicated legal questions without benefit of "extended reflection [or] extensive information." [(Citation omitted)].
> Courts of appeals, on the other hand, are structurally suited to the collaborative judicial process that promotes decisional accuracy. With the record having been constructed below and settled for purposes of the appeal, appellate judges are able to devote their primary attention to legal issues. As questions of law become the focus of appellate review, it can be expected that the parties' briefs will be refined to bring to bear on the legal issues more information and more comprehensive analysis than was provided for the district judge. . . .
> Independent appellate review necessarily entails a careful consideration of the district court's legal analysis, and an efficient and sensitive appellate court at least will naturally consider this analysis in

undertaking its review.

Id. at 232. I find nothing about this description of the roles of the tribunals that is inapposite to the relationship between the BIA and the courts of appeals. Both the BIA and, of course, the INS more generally, have very significant case loads of "moral turpitude" cases in which factual issues and time pressures may significantly outweigh any immigration judge's or BIA member's ability to address complicated legal questions, such as the correct interpretation of state law. The BIA certainly has no more expertise or understanding of state law than does the district court, see Norton, 902 F.2d at 1357 (suggesting that district court's "expertise" in interpreting the law of the state in which it sits is a basis for deferential appellate review), although it may well have fewer facilities to make a proper examination and interpretation of state law based upon interpretations by the state's courts than does a district court. This factor would certainly suggest that the BIA should be accorded less deference in its interpretations of state law than is the district court. However, if the appellate court encounters a decision of either the BIA or a district court in which the tribunal's "analytical sophistication and research have exhausted the state-law inquiry," then "little more need be said in the appellate opinion." Id. at 224-25. I see absolutely no reason why a federal agency or agency tribunal should be accorded more deference than a federal court in interpreting state law upon which its decisions may depend. Indeed, it strikes me as odd that one would suggest otherwise.[4] In deciding whether a crime defined by state law is a crime in which moral turpitude necessarily inheres, the BIA is performing precisely the same sort of interpretation of the requirements and meaning of state law as is a federal court interpreting and

---

[4]Although it is possible that my perception of the oddity of according a federal agency greater deference than is given a federal district court may be somewhat colored by the fact that I am a federal district court judge, I nonetheless believe the proposition survives on its own merits.

applying state law.

In my opinion, therefore, when the question is whether a particular crime defined by state law fits within the federal standard for a "crime involving moral turpitude," the state-law definition of the crime and whether that definition necessarily involves moral turpitude under the federal standard are questions of law that should be subject to pure de novo review without any deference to the INS's conclusions.  See, e.g., Rodriquez-Herrera, 52 F.3d at 240 n.4; Gonzalez-Alvarado, 39 F.3d at 246; Goldeshtein, 8 F.3d at 647 n.4; and compare Cabral, 15 F.3d at 196 (state law determines the elements of the offense of conviction, citing In re H, 71 I. & N. Dec. 359, 360 (BIA 1956), but applying deferential review to INS's application of standard to crime as defined by state law).[5]  I recognize that in Okoroha, the Eighth Circuit Court of Appeals also applied the deferential standard of review to the question of whether or not a particular crime was a "crime involving moral turpitude" for deportation purposes.  Okoroha, 715

---

[5]I note a further point of distinction in the decisions of courts applying "reasonableness" versus true "de novo" reviews of INS action.  When courts apply a two-prong test to the question of whether the agency's action was appropriate, involving the questions, first, whether the agency has applied the proper legal standard and, second, whether there is substantial evidence that the case falls withing that standard, courts again diverge. Compare Animashaun v. INS, 990 F.2d 234, 237 (5th Cir. 1993) (applying reasonableness review to both prongs, including (1) whether the agency's interpretation of "crime involving moral turpitude" is reasonable, and (2) whether the BIA's conclusion that the legal standard has been met was reasonably based on substantial evidence; however, the case involved the question of whether an alien had been convicted of two crimes of moral turpitude that were not a "single scheme" under § 241(a)(2)(A)(ii), not whether the crimes involved were "crimes involving moral turpitude"); with Abedini v. U.S. INS, 971 F.2d 188, 190-91 (9th Cir. 1992) (review is de novo as to whether the BIA has properly determined the purely legal question of the requirements of the Immigration and Nationality Act, but review of "substantial evidence" that the legal standard has been met is on the basis of what a reasonable fact finder could conclude).  The case presently before this court, however, raises no "substantial evidence" question.

F.2d at 382 (citing <u>Jong Ha Wang</u>, 450 U.S. at 139).  However, for the reasons stated here I would overrule <u>Okoroha</u> on this point.  Nonetheless, I agree that, under the proper standard of review, the crime in question in <u>Okoroha</u>, possession of stolen mail, is indeed a "crime involving moral turpitude."  <u>See</u> <u>Okoroha</u>, 715 F.2d at 382 (knowledge that mail was stolen was an element of the offense, which therefore was a crime involving moral turpitude).

To summarize in the light of issues before this court, in my view, whether the INS has properly defined "crime involving moral turpitude" is a matter in which the INS is entitled to deference as the agency charged with implementing the immigration statute.  However, how the crime in question is defined under <u>state</u> law, and whether the nature of the crime under state law defines a crime that necessarily involves moral turpitude, are questions of law for the appellate court to review <u>de novo</u> with no deference to the INS's conclusions whatsoever.

### B.  The Basis For Determinations

Although I disagree with giving any deference to the BIA's or the INS's conclusions about whether a particular crime is one necessarily involving moral turpitude, I agree with the majority that in determining whether the crime of which the alien has been convicted falls within one of the grounds for deportation under § 241(a)(2)(A), both the court and the BIA look only at the definition of the crime under state law, and not at the underlying facts and circumstances of the alien's particular offense. <u>Ramsey v. INS</u>, 55 F.3d 580, 583 (11th Cir. 1995) (interpretation of "aggravated felony" under § 241(a)(2)(A)(iii), 8 U.S.C. § 1251(a)(2)(A)(iii)); <u>Rodriguez-Herrera</u>, 52 F.3d at 239-40 (interpretation of "moral turpitude" under § 241(a)(2)(A)(i) & (ii)); <u>Gonzalez-Alvarado</u>, 39 F.3d at 246 ("moral turpitude"); <u>United States v. Reyes-Castro</u>, 13 F.3d 377, 379 (10th Cir. 1993) ("aggravated felony"); <u>Goldeshtein</u>, 8 F.3d at 647 ("moral turpitude"); <u>McNaughton v. INS</u>, 612 F.2d 457, 459 (9th Cir. 1980)

("moral turpitude"); <u>United States ex rel. Robinson v. Day</u>, 51 F.2d 1022, 1022-23 (2d Cir. 1931) ("moral turpitude").[6]  Thus, in addition to the state-law definition of the crime charged, both the BIA and the reviewing court look only at the record of conviction, which includes the crime as described in the indictment or information, the plea, the verdict or judgment, and the sentence, but not any evidence offered in the case or other facts or circumstances involved.  <u>Cabral</u>, 15 F.3d at 196 & n.6;[7]

_____

[6]This legal principle explains why neither the majority nor I have thus far recited the facts of the case.  However, because appellant urges us to consider those facts, despite this blackletter rule, I will indulge her so far as to recite, albeit very briefly, what the facts and circumstances of her conviction were.  Myrisia Franklin is a native and citizen of the Philippines.  She entered the United States at Los Angeles, California, on December 15, 1987.  She is 28 years old and the mother of three children.  However, on June 4, 1991, while she was expecting her fourth child, her husband severely beat their three-year old son, who later died of peritonitis.  Franklin's husband is now serving a twenty-year sentence for the child's murder.  On October 15, 1992, Franklin was found guilty in a bench trial of involuntary manslaughter in the death of her son on a charge that she had failed to seek medical treatment for him although she knew he was in distress.  She was sentenced to three years confinement in a correctional facility.  Her sentence was affirmed by the Missouri Court of Appeals on September 7, 1993.  The INS initiated deportation proceedings on May 21, 1993, but on the ground that Franklin had failed to petition for removal of the conditional basis of her admission and her conditional status had terminated on May 5, 1990.  On February 14, 1994, the INS added as a further ground for Franklin's deportation her conviction of a crime involving moral turpitude. On March 8, 1994, an immigration judge ordered Franklin deported on both grounds.  During Franklin's administrative appeal, the INS withdrew the "conditional status" charge, but, on September 13, 1994, the BIA found Franklin deportable on the "moral turpitude" charge.

[7]The <u>Cabral</u> court described the purpose behind limiting what the tribunals review in the deportation proceedings to the record of conviction as "administrative workability."  <u>Cabral</u>, 15 F.3d at 196 n.6.  This rule relieves the BIA and the courts of the onerous burden of taking and considering evidence and retrying mitigating or extenuating factors that might relieve the alien of the "the stigma of moral obliquity," and thereby prevents a "satellite proceeding" far from the original crime scene.  <u>Id.</u> (citing cases so holding); <u>see also</u> <u>Chiaramonte v. INS</u>, 626 F.2d 1093, 1099 (2d

United

Cir. 1980) (same concern with looking beyond general classification
of crime).

-22-

States v. Chu Kong Yin, 935 F.2d 990, 1003 (9th Cir. 1991) (BIA and reviewing court are limited to the record of conviction and may not look behind the record to the facts of the individual case); Alleyne v. U.S. INS, 879 F.2d 1177, 1185 (3d Cir. 1989) (same); but see Kabongo v. INS, 837 F.2d 753, 758 (6th Cir.) (court looked at "facts of the present case, where petitioner has acknowledged his false statements and the statements made to defraud the United States Government," to find that "the convictions may be considered as involving moral turpitude for purposes of denying voluntary departure."), cert. denied, 488 U.S. 982 (1988); Wadman v. INS, 329 F.2d 812, 814 (9th Cir. 1964) ("record of conviction" includes "the indictment or information, plea, verdict or judgment and sentence"); Matter of Ghunaim, 15 I. & N. Dec. 269, 270 (BIA 1975) (record of conviction includes "charge or indictment, the plea, the judgment or verdict, and the sentence," citing United States ex rel. Teper v. Miller, 87 F. Supp. 285, 287 (S.D.N.Y. 1949)).  Refusal to consider anything but a categorical definition of the crime involved appears to be almost universal in majority decisions.[8]  Thus, appellant's arguments based on the facts in her

---

[8]However, occasional dissents from this view can be found. For example, in his dissent from the majority opinion in Marciano v. INS, 450 F.2d 1022 (8th Cir. 1971), cert. denied, 405 U.S. 997 (1972), district judge Garnett Thomas Eisele took the view that "a proper reading of the phrase 'crime involving moral turpitude,' contained in 8 U.S.C.A. § 1251(a)(4), would require that the case be returned to the Board of Immigration Appeals to determine if the petitioner's criminal conduct here did or did not, factually, 'involve moral turpitude.'"  Marciano, 450 F.2d at 1026 (Eisele, J., dissenting).  Judge Eisele believed such an approach was required, instead of review of only the "general nature" of the crime and its classification, because categorical review did not fit with congressional intent.  Id.  It was Judge Eisele's view that "Congress did not decree deportation where there was a conviction of a crime which 'generally' or 'commonly' involves moral turpitude, [but] it meant [to authorize deportation] when moral turpitude was in fact involved."  Id. at 1028.  In support of this position, Judge Eisele pointed out that "[t]he statute says deportation shall follow when the crime committed involves moral turpitude, not when that type of crime 'commonly' or 'usually' does."  Id.

-23-

specific case do not persuade me any more than they did the majority.[9]

Although I find universal agreement that the state law defining the criminal offense of which the alien has been

---

[9]Both in her brief and at oral arguments, appellant strenuously urged that we consider the facts of the particular case leading to her conviction. Although both the majority and I reject her arguments here, and, indeed, I do not find the facts of this case particularly sympathetic, any hardship that deportation may impose upon the alien may be relevant to whether an alien is ultimately deported. An alien who has been a lawful permanent resident of the United States for at least seven years and who has been found deportable on certain grounds may seek a waiver of inadmissibility or relief from deportation under § 212(c), 8 U.S.C. § 1182(c). See, e.g., Hajiani-Niroumand v. INS, 26 F.3d 832, 834–35 (8th Cir. 1994); Varela-Blanco v. INS, 18 F.3d 584, 586 (8th Cir. 1994); see also Dashto v. INS, 59 F.3d 697, 702 (7th Cir. 1995). Such relief is discretionary, not an entitlement, but the INS "'must balance "the social and humane considerations in the alien's favor against any adverse factors that demonstrate his or her undesirability as a permanent resident of the United States.'" Dashto, 59 F.3d at 702 (quoting Henry v. INS, 8 F.3d 426, 432 (7th Cir. 1993)); Yepes-Prado v. INS, 10 F.3d 1363, 1365-66 (9th Cir. 1993). The Eight Circuit Court of Appeals has recognized a number of factors, including hardship to the alien and the alien's family, and other factors appellant suggests are present in this case, as weighing in the alien's favor, as well as negative factors weighing in favor of deportation, in this "balance of equities" under 212(c). Hajiani-Niroumand, 26 F.3d at 835; Varela-Blanco, 18 F.3d at 586. However, because we have been presented with no issue involving relief from deportation pursuant to § 212(c), I take no position on whether Myrisia Franklin's circumstances and the facts involved in her conviction might warrant relief under § 212(c), nor do I even hazard a casual opinion as to whether she might meet the initial qualifications for requesting such relief.

Similarly, in considering whether an applicant for asylum or withholding of deportation is ineligible for relief pursuant to 8 U.S.C. § 1253(h)(2)(B), because the applicant has been convicted of "a particularly serious crime," courts have authorized the BIA to consider the nature of the conviction, the type of sentence imposed, and the circumstances and facts underlying the conviction in determining whether or not the crime was "particularly serious." See Mahini v. INS, 779 F.2d 1419, 1421 (9th Cir. 1986).

convicted, and not the facts or circumstances involved in the individual alien's case, is the basis for determining whether or not the crime of which the alien has been convicted is one involving moral turpitude, I do not find universal agreement on what, precisely, is meant by "state law" defining the offense. The state law element is often stated in limited terms as the state <u>statute</u> defining the offense. <u>See, e.g.,</u> <u>Rodriquez-Herrera</u>, 52 F.3d at 239 ("[W]e must focus on the crime categorically as defined by the [Washington] statute . . . ."); <u>Gonzalez-Alvarado</u>, 39 F.3d at 246 n.2 ("[W]e consider the elements or nature of a crime as defined by the relevant statute, not the actual conduct that led to the conviction."); <u>Goldeshtein</u>, 8 F.3d at 647.

However, the state law definition of the crime has also been described as consisting of both the statute and decisions of the state's highest court construing the statute. <u>See, e.g.,</u> <u>Graqeda v. U.S. INS</u>, 12 F.3d 919, 921 (9th Cir. 1993) ("Whether a particular crime involves moral turpitude 'is determined by the statutory definition or by the nature of the crime not by the specific conduct that resulted in the conviction,'" quoting <u>McNaughton v. INS</u>, 612 F.2d 457, 459 (9th Cir. 1980)); <u>Gutierrez-Chavez v. INS</u>, 8 F.3d 26 (Table), 1993 WL 394916, **2-**3 (9th Cir. 1993) (court looked to decisions of state's highest court to determine proper interpretation of intent element of Alaska statute for purposes of determining whether crime of second degree theft was a "crime involving moral turpitude"); <u>Holzapfel v. Wyrsch</u>, 259 F.2d 890, 892 (3d Cir. 1958) (looking to state case law to interpret a "relatively new and novel piece of legislation" defining a sex offense by statute). Our own circuit court of appeals has looked to the interpretation of statutorily-defined crimes by the state's highest court in determining whether or not the crime so defined necessarily involves moral turpitude. <u>Marciano v. INS</u>, 450 F.2d 1022, 1024 (8th Cir. 1971), <u>cert. denied</u>, 405 U.S. 997 (1972). Nor has the BIA been reluctant to look to the decisions of the state's highest court when interpreting the

elements of the offense of which the alien is convicted to determine whether those elements include the necessary elements for the crime to be one that inherently involves moral turpitude. See, e.g., Matter of Ghunaim, 15 I. & N. Dec. 269, 270 (BIA 1975) (looking at decisions of Ohio courts to determine whether the manslaughter statute in question included both voluntary and involuntary manslaughter, because involuntary manslaughter did not involve moral turpitude); Matter of Szegedi, 10 I. & N. Dec. 28, (BIA 1962) (looking at decisions of Wisconsin Supreme Court to determine elements distinguishing degrees of murder and manslaughter in order to determine which crimes involved the necessary intent element to be crimes involving moral turpitude). I believe that a focus solely on the statutory language is improper, because it permits a "categorical" definition of the crime that may, in fact, be out of step with the case law of the state interpreting the statutory elements.[10] This case, as I shall show, vividly demonstrates this problem.

Looking at how a state's highest court has construed the elements of a crime defined by a state statute comports with common sense and is the best way to insure that the constitutional requirement of a "uniform rule of naturalization," U.S. Const. art. I, § 8, cl. 4, is met. Cf. Nemetz v. INS, 647 F.2d 432, 435 (4th Cir. 1981) (reference to state statutes to determine whether a crime of moral turpitude had been committed by an alien seeking to prove his good moral character for purposes of naturalization undermined constitutional requirement of a "uniform rule of

_____

[10]Anyone who has ever prepared jury instructions in a criminal case in which the crime is defined by statute will appreciate my observation that judicial interpretations of statutes, as much or more than the language of the statute, define the "nature of the crime" of which a person is convicted. To close one's eyes to that case law could well result in reversible error in a criminal case; to close one's eyes to judicial interpretations of state criminal law in making a deportation decision is, to my mind, to commit an error of similar proportions.

naturalization").[11]  It is readily apparent that the highest courts of different states may construe nearly identical statutory language in different ways, and thus mere identity of statutory language does not necessarily indicate identical elements of the offenses, or identical meaning of those elements, as they are defined by comparable statutes. However, where the BIA and the reviewing courts look to the judicial interpretation of a criminal statute by the state's highest court, the BIA and the reviewing court can determine whether the crime <u>necessarily</u> involves moral turpitude, not just whether it <u>appears</u> to define a crime in which moral turpitude necessarily inheres.  <u>Goldeshtein</u>, 8 F.3d at 647 (crime must be one in which moral turpitude necessarily inheres); <u>Chu Kong Yin</u>, 935 F.2d 990, 1003 (9th Cir. 1991) (same); <u>Wadman v. INS</u>, 329 F.2d 812, 814 (9th Cir. 1964) (same); <u>Tseung Chu v. Cornell</u>, 247 F.2d 929, 935 (9th Cir.) (same), <u>cert. denied</u>, 355 U.S. 892 (1957).[12]  "Uniformity" would thereby be served, not

---

[11]In <u>Nemetz</u>, the Fourth Circuit Court of Appeals feared that looking to laws which vary from state to state to determine whether a crime involving moral turpitude had been committed could only lead to differing and often inconsistent results based on "accident[s] of geography," because one state might criminalize conduct permitted in another state.  <u>Id.</u>  Although the court concluded that federal courts "can appropriately look to state law in the initial stage of determination," when use of state law defeats uniformity, the court should devise a federal standard by other means.  <u>Id.</u>

[12]This approach would, I believe, protect the alien from deportation based on conviction of a crime in which the BIA mistakenly finds moral turpitude necessarily inheres, without creating the dangers of a "satellite proceeding" over guilt of the offense feared by the First Circuit Court of Appeals in <u>Cabral</u>. <u>Cabral</u>, 15 F.3d at 196 n.6.  It would not, however, go nearly far enough to suit Judge Eisele, dissenting in <u>Marciano</u>, 450 F.2d at 1026-28.  Both Judge Eisele and the majority in that decision assumed that the court should look to state judicial decisions interpreting the state statute in question.  <u>Id.</u>  However, Judge Eisele still believed that courts making such a review did not meet the standards of determining whether the alien had actually been convicted of a crime in which moral turpitude inhered.  <u>Id.</u>

undermined.[13]  The standard would be uniformly applied to the same category of criminal _conduct_, not just to crimes described in the same or similar language.

Nor does looking to state judicial explications of the elements of an offense make the effect of the federal statute "depend upon the niceties and nuances of a state procedure." _Burr v. INS_, 350 F.2d 87, 90 (9th Cir. 1965); _see also_ _Babouris v. Esperdy_, 269 F.2d 621, 623 (2d Cir. 1959) ("It is not to be supposed that Congress intended an alien's deportability to be determined by the various classifications of misconduct evolved by the states for jurisdictional or other internal application.").  The federal standard remains intact; state case law is only relevant to deciding whether the crime does indeed involve the elements of moral turpitude required under the federal standard, as the crime is defined by the courts properly charged with interpreting the criminal statute in question and deciding cases under it.

Having examined why I disagree with the majority on the question of what standard of review is applicable to which issues presented in this appeal, and the basis upon which the BIA's and the appellate court's decisions should be made, I will next turn to

---

[13]I am not suggesting that the information to be extracted from state cases construing a statute and thereby controlling on the meaning of a statutorily-defined crime is the state court's determination of whether or not the crime defined by statute is one involving moral turpitude.  _See, e.g._, _Gonzales v. Barber_, 207 F.2d 398, 400 (9th Cir. 1953) (state court's determination that crime of assault with a deadly weapon under a California statute did not involve moral turpitude for purposes of determining an attorney's fitness to practice law was not controlling on the question of whether the crime so defined involved moral turpitude for the purposes of deportation), _aff'd_, 347 U.S. 637 (1954).  What I am suggesting is that how the elements of the offense are defined by a statute and case law constructions of that statute provides the essential information whereby the INS, the BIA, or the courts can determine whether the crime defined necessarily involves moral turpitude.

the opinion of the BIA that is under review here, then to the questions involved in deciding whether or not the BIA's decision in this case should stand.

### III.  THE DECISION BELOW

In the decision below, the BIA considered solely the issue of whether Franklin's conviction for involuntary manslaughter under Missouri law had been for a crime involving moral turpitude as required by the applicable statute.  The BIA defined moral turpitude as referring generally to "conduct which is inherently base, vile, or depraved, and contrary to the accepted rules of morality and duties owed between persons or to society in general," citing two prior BIA decisions, Matter of Danesh, 19 I. & N. Dec. 669 (BIA 1988), and Matter of Flores, 17 I. & N. Dec. 225, 227 (BIA 1980).  The BIA also recognized that moral turpitude has been defined as "an act which is per se morally reprehensible and intrinsically wrong, or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude," citing Matter of P., 6 I. & N. Dec. 795 (BIA 1955).

The BIA found that the crime of which Franklin was convicted, involuntary manslaughter under Mo. Rev. Stat. § 565.024, involved "recklessly caus[ing] the death of another person."  The BIA next found that Missouri's statutory definition of "reckless" as "a conscious disregard of a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation," Mo. Rev. Stat. § 562.016(4), necessarily involved moral turpitude as an element of the offense of which Myrisia Franklin had been convicted.  The BIA's decision was based on similar definitions of criminally reckless conduct found by the BIA to involve moral turpitude in two prior decisions, Matter of Medina, 15 I. & N. Dec. 611 (BIA 1976), aff'd sub nom. Medina-Luna v. INS, 547 F.2d 1171

-29-

(7th Cir. 1977), and <u>Matter of Wojtkow</u>, 18 I. & N. Dec. 111 (BIA 1981).

The BIA rejected the argument that its own prior cases had historically distinguished between voluntary and involuntary manslaughter, finding the former were crimes involving moral turpitude while the latter were not, on the ground that such decisions ante-dated the decisions holding that criminally reckless conduct could involve moral turpitude. The BIA also rejected a black-letter conclusion that involuntary manslaughter never involves moral turpitude, finding that the specific statute under which the alien was convicted must be examined on a case-by-case basis. Finally, the BIA specifically overruled its prior cases holding that involuntary manslaughter is not a crime involving moral turpitude.[14]

## IV.  ANALYSIS

I turn now to whether or not I would let stand the BIA's decision in this case.  I look first at the question of the propriety of the INS's construction of the phrase "crime involving moral turpitude."  As I concluded above, this question is properly a matter reviewed under the <u>Chevron</u> standard to determine the "reasonableness" of the INS's construction.

An analysis of the reasonableness of the INS's interpretation of the statute should be conducted in light of the legislative history and purpose of the statute.  <u>See, e.g.,</u> <u>Chevron</u>, 467 U.S.

---

[14]In the opinion below, the BIA identified the following decisions of the BIA as holding that involuntary manslaughter is not a crime involving moral turpitude, but stated that these decisions were now overruled on that issue by the decision in this case:  <u>Matter of Ghunaim</u>, 15 I. & N. Dec. 269, 270 (BIA 1975); <u>Matter of Lopez</u>, 13 I. & N. Dec. 725, 726 (BIA 1971);  <u>Matter of Sanchez-Marin</u>, 11 I. & N. Dec. 264, 266 (BIA 1965); <u>Matter of Szegedi</u>, 10 I. & N. Dec. 28, 34 (BIA 1962); <u>Matter of B</u>, 4 I. & N. Dec. 493, 496 (BIA 1951).

at 845; <u>Ramsey</u>, 55 F.3d at 582 (discussion of INS's interpretation of "aggravated felony" in § 241(a)(2)(A)(iii) "begins with the text and relevant history" of the provision).  However, all of the decisions I have examined that consider the meaning of moral turpitude have relied heavily on prior precedent to decide the reasonableness of including any category of crimes within that definition.  I have no doubt that the reasonableness of the BIA's interpretation should therefore also be tested in light of precedent, both BIA and judicial, or our system of judicial decision making and judicial review means nothing.  <u>See, e.g.,</u> <u>Mahini v. INS</u>, 779 F.2d 1419, 1420 (9th Cir. 1986) (where review of agency action is for reasonableness, court looked to agency's adherence to its own prior rulings).  Furthermore, unlike the terms used in the Clean Air Act Amendments of 1977, which were the statutory provisions the meaning of which was at issue in <u>Chevron</u>, <u>see</u> <u>Chevron</u>, 499 U.S. at 840, the phrase "crime involving moral turpitude" has a long history of meaning under the common law and the statutory law of the United States and the various states.  It seems to me that it would be inappropriate to consider the reasonableness of the INS's interpretation, even of this phrase in a statute the INS is charged with implementing, without giving due consideration to the meanings and elements of the phrase as found by the courts.

## A.  Purpose And History

The Supreme Court has observed that the "general legislative purpose" of the predecessor to the present § 241(a)(2)(A), former § 241(a)(4) of the Immigration and Nationality Act of 1952, was to "broaden the provisions governing deportation, 'particularly those referring to criminal and subversive aliens.'"  <u>Costello</u>, 376 U.S. at 120 (citing Commentary on the Immigration and Nationality Act, Walter M. Besterman, Legislative Assistant to the House Committee

on the Judiciary, 8 U.S.C.A., pt. I, p. 61).[15]  However, the "moral turpitude" ground for deportation has a much longer history.  The term "moral turpitude" first appeared in the Immigration Act of March 3, 1891, 26 Stat. 1084, which directed the exclusion of "persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude."  Jordan, 341 U.S. at 229.  The "moral turpitude" provision was reenacted in similar form in the Immigration Act of 1903, § 2, Act of March 3, 1903, 32 Stat. 1213, and again in the Immigration Act of 1907, § 2, Act of February 20, 1907, 34 Stat. 898.  Id.  Prior to the Act of 1952, the "moral turpitude" provision was found in § 19 of the Immigration Act of 1917, 8 U.S.C. § 155(a).  See, e.g., Jordan, 341 U.S. at 224.  The "crime involving moral turpitude" provision of the immigration acts was § 241(a)(4) of the Act of 1952, 8 U.S.C. § 1251(a)(4).  Costello, 476 U.S. at 125.  There the provision remained until passage of the Immigration Act of 1990, which revised and recodified the relevant provision to § 241(a)(2)(A), 8 U.S.C. § 1251(a)(2)(A).  Rodriguez-Herrera, 52 F.3d at 239 n.1; Gonzalez-Alvarado v. INS, 39 F.3d 245, 246 n.2 (9th Cir. 1994).

As the Supreme Court noted in Jordan, a decision considering whether the phrase "crime involving moral turpitude" lacked sufficiently definite standards to justify deportation proceedings, "moral turpitude" is an issue that arises in circumstances other than deportation proceedings:

The term "moral turpitude" has deep roots in

---

[15]In Costello, the Court identified other sources of legislative history for this provision as the following:  H.R. Rep. No. 1365, 82d Cong., 2d Sess., 60 (1952); S. Rep. No. 1515, 81st Cong., 2d Sess., 390-92 (1950); S. Rep. No. 1137, 82d Cong., 2d Sess., 21 (1952); H.R. Rep. No. 2096 (Conference Report), 82d Cong., 2d Sess., 127 (1952); Immigration and Naturalization Service, Analysis of S. 3455, 81st Cong., 2d Sess. (195), Vol. 5, pp. 241-3 through 241-6; Analysis of S. 716, 82d Cong., 1st Sess. (1951), Vol. 4, pp. 241-2 through 241-4.  Costello, 376 U.S. at 126 n.9.  Unfortunately, few of these sources shed any light on the specific questions now before the court.

the law.  The presence of moral turpitude has been used as a test in a variety of situations, including legislation governing the disbarment of attorneys and the revocation of medical licenses.  Moral turpitude also has found judicial employment as a criterion in disqualifying and impeaching witnesses, in determining the measure of contribution between joint tort-feasors, and in deciding whether certain language is slanderous.

Jordan, 341 U.S. at 227 (footnotes omitted).  The Supreme Court subsequently added to this list of uses of the "moral turpitude" standard when it considered a provision of the Alabama Constitution of 1901 which disqualified voters convicted of "any . . . crime involving moral turpitude."  Hunter v. Underwood, 471 U.S. 222, 226 (1985).

More generally, one of the classic dichotomies of criminal law is the distinction between crimes that involve moral turpitude and those that do not.  See generally New Jersey v. T.L.O., 469 U.S. 325, 379 n.21 (1985) (Stevens, concurring in part and dissenting in part) (noting dichotomy in classification of crimes as "misdemeanors or felonies, malum prohibitum or malum in se, crimes that do not involve moral turpitude or those that do, and major and petty offenses," citing generally W. LaFave, Handbook on Criminal Law § 6 (1972)); Kempe v. United States, 151 F.2d 680, 688 (8th Cir. 1945) (noting that crimes have been divided according to their nature into crimes mala in se and crimes mala prohibita, and noting further that "[g]enerally, but not always, crimes mala in se involve moral turpitude, while crimes mala prohibita do not."); and compare Matter of P., 6 I. & N. Dec. 795 (BIA 1955) (cited by the BIA below for its definition of moral turpitude as "an act which is per se morally reprehensible and intrinsically wrong, or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude," thus equating crimes mala in se with crimes involving moral turpitude).

Nonetheless, despite its use in a number of circumstances and presence as a standard for deportation in the immigration laws of the United States for just over a century, the meaning of the phrase "crime involving moral turpitude" has defied absolute definition. Jordan, 341 U.S. at 233 (Jackson, J., dissenting). Although there is general agreement that in order to be grounds for deportation, the crime of which the alien is convicted must be one that necessarily involves moral turpitude, see, e.g., Goldeshtein, 8 F.3d at 647 (crime must be one in which moral turpitude necessarily inheres); Chu Kong Yin, 935 F.2d at 1003 (same); Wadman, 329 F.2d at 814 (same); Tseung Chu, 247 F.2d at 935 (same); Ablett v. Brownell, 240 F.2d 625 (D.C. Cir. 1957); United States ex rel. Giglio v. Neelly, 208 F.2d 337 (7th Cir. 1953); United States ex rel. Guarino v. Uhl, 107 F.2d 399 (2d Cir. 1929), courts have often had extreme difficulty determining whether specific crimes are crimes that meet this requirement. See, e.g., Dunn v. INS, 419 U.S. 919, 919 (1974) (Stewart, J., dissenting from denial of certiorari) ("It is far from clear that refusing induction is a 'crime involving moral turpitude.'").

## B. Lack Of Congressional Guidance

The difficulties faced by the courts and admittedly confronted by the INS are not entirely of their own making. As the dissenters in Jordan observed, and no court, to my knowledge, has ever disagreed, "The uncertainties of this statute do not originate in contrariety of judicial opinion. Congress knowingly conceived it in confusion." Jordan, 341 U.S. at 233 (Jackson, J., dissenting). Only a very few courts have looked to legislative history for some guidance on the meaning of the "moral turpitude" provision in the deportation acts, and all of these, like the dissenters in Jordan, have pointed to the comments of Rep. Sabath in the hearings of the House Committee on Immigration on what eventually became the Act of 1917:

> [Y]ou know that a crime involving moral
> turpitude has not been defined. No one can

really say what is meant by saying a crime involving moral turpitude. Under some circumstances, larceny is considered a crime involving moral turpitude—that is, stealing. We have laws in some States under which picking out a chunk of coal on a railroad track is considered larceny or stealing. In some States it is considered a felony. Some States hold that every felony is a crime involving moral turpitude. In some places the stealing of a watermelon or a chicken is larceny. In some States the amount is not stated. Of course, if the larceny is of an article, or a thing which is less than $20 in value, it is a misdemeanor in some States, but in other States there is no distinction.

Hearings before House Committee on Immigration and Naturalization on H.R. 10384, 64th Cong., 1st Sess. 8 (comments of Rep. Sabath); see also Jordan, 341 U.S. at 233-34 (Jackson, J., dissenting) (quoting this passage); Cabral, 15 F.3d at 195 (quoting these comments and recognizing Justice Jackson's quotation of them in support of the First Circuit Court of Appeals' conclusion that "[t]he legislative history leaves no doubt . . . that Congress left the term 'crime involving moral turpitude' to further administrative and judicial interpretation."). Justice Jackson observed that "[d]espite this notice, Congress did not see fit to state what meaning it attributes to the phrase 'crime involving moral turpitude.'" Id. at 234.

### C. The Anecdotal Approach To Defining "Crimes Involving Moral Turpitude"

In the face of the difficulty of determining what crimes involve moral turpitude and the lack of congressional guidance as to the meaning of the phrase, courts have approached the problem of defining the phrase "crime involving moral turpitude" in anecdotal fashion. Courts have found consistently that certain categories of crimes involve "moral turpitude," but whether or not "moral turpitude" inheres in other categories of crimes has left courts if not lost, at least bewildered. I shall wander first through the safe ground in the "moral turpitude" landscape, before venturing,

with no small trepidation, into the terra incognita which I believe is the place where this case can be found.

Some cases, as I said at the outset of this dissent, in which an alien is found deportable for commission of a crime assertedly involving moral turpitude, can be decided with relative ease and dispatched with brevity. Such "easy" cases are those in which the alien has been convicted of a crime with an element of fraud. Over four decades ago, the Supreme Court found that "[w]ithout exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude." Jordan, 341 U.S. at 227. Furthermore,

> [i]n every deportation case where fraud has been proved, federal courts have held that the crime in issue involved moral turpitude. This has been true in a variety of situations involving fraudulent conduct: obtaining goods under fraudulent pretenses; conspiracy to defraud by deceit and falsehood; forgery with intent to defraud; using the mails to defraud; execution of chattel mortgage with intent to defraud; concealing assets in bankruptcy; issuing checks with intent to defraud. In the state courts, crimes involving fraud have universally been held to involve moral turpitude.
>
> Moreover, there have been two other decisions by courts of appeals prior to the decision now under review on the question of whether the particular offense before us in this case [conspiracy to violate the internal revenue laws by possessing and concealing distilled spirits with intent to defraud the United States of taxes] involves moral turpitude within the meaning of § 19(a) of the Immigration Act. . . .
>
> In view of these decisions, it can be concluded that fraud has consistently been regarded as such a contaminating component in any crime that American courts have, without exception, included such crimes within the scope of moral turpitude. It is therefore clear, under an unbroken course of judicial decisions, that the crime of conspiring to defraud the United States is a "crime involving moral turpitude."

Id. at 227-29; see also Izedonmwen v. INS, 37 F.3d 416, 417 (8th Cir. 1994) ("'crimes in which fraud was an ingredient have always been regarded as involving moral turpitude,'" quoting Jordan, 341 U.S. at 232); Mendoza v. INS, 16 F.3d 335, 336 (9th Cir. 1994) (no issue on appeal of whether welfare fraud constituted "crime involving moral turpitude"; issue was whether alien's return after three-day departure constituted "entry" within meaning of 8 U.S.C. § 1101(a)(13) and 8 U.S.C. § 1251(a)(2)(A)(i)); Kabongo v. INS, 837 F.2d 753, 758 n.8 (9th Cir.), cert. denied, 488 U.S. 982 (1988) (fraud crimes are always crimes involving moral turpitude); Winestock v. INS, 576 F.2d 234, 235 (9th Cir. 1978) (same); Lozano-Giron v. INS, 506 F.2d 1073, 1077 (7th Cir. 1974) (same); Burr v. INS, 350 F.2d 87, 91 (9th Cir. 1965) (same). Indeed, for some courts, the absence of an element of fraudulent conduct from the definition of the crime has been sufficient to find that the crime was not one involving moral turpitude. See, e.g., Chaunt v. United States, 364 U.S. 350, 353 (1960) (breach of peace not a crime involving moral turpitude, because no "fraudulent conduct" was involved).

Courts have consistently held that statutory rape is a crime involving moral turpitude, even though it has no intent element, because such a crime is "usually classed as rape," which "manifestly involves moral turpitude." See, e.g., Marciano, 450 F.2d at 1025 (citing cases so holding). So, too, courts have expressed similar certainty that theft crimes involve moral turpitude. See, e.g., Dashto v. INS, 59 F.3d 697, 699 (7th Cir. 1995) (recognizing prior decision holding that "'[t]heft has always been held to involve moral turpitude, regardless of the sentence imposed or the amount stolen,'" quoting Soetarto v. INS, 516 F.2d 778, 780 (7th Cir. 1975)); United States v. Villa-Fabela, 882 F.2d 434, 440 (9th Cir. 1989) ("theft[s] [are] crime[s] of moral turpitude."), overruled on other grounds, United States v. Proa-Tovar, 975 F.2d 592, 595 (9th Cir. 1992) (en banc); Chiaramonte v. INS, 626 F.2d 1093, 1097 (2d Cir. 1980) (thefts are presumed to be

crimes involving moral turpitude "however they may be technically translated into domestic penal provisions," and citing cases so holding); Christianson v. United States, 226 F.2d 646, 655 (8th Cir. 1955) (for purposes of impeaching a witness, crimes of larceny and embezzlement have always been held to involve moral turpitude), cert. denied, 350 U.S. 994 (1956); United States ex rel. Berlandi v. Reimer, 113 F.2d 429, 431 (2d Cir. 1940) ("An intent to steal or defraud in the [case of one who defrauds a private citizen of property] has repeatedly been held to render an offense one which involves moral turpitude and for which an alien may be deported or excluded under the Immigration Laws," and finding an intent to defraud element in forgery). This certainty of the courts remains in spite of, or perhaps because of, Congress's refusal to define "crime involving moral turpitude" with greater specificity even after Rep. Sabath pointed out that state theft laws were not uniform. See supra, p. - 33 -. As the Second Circuit Court of Appeals observed, "whatever the vicissitudes of the state laws of larceny, it is clear that for immigration purposes, a crime of moral turpitude is involved when . . . one carries away property knowing it to belong to another." Chiaramonte, 626 F.2d at 1099 (citing Gordon & Rosenfield, Immigration Law and Procedure § 4.14(d)(1977)).[16]

Of greater pertinence here are cases involving homicides. Courts have uniformly held voluntary murder to be a "crime involving moral turpitude." Cabral, 15 F.3d at 195-96 (citing Fong Haw Tan v. Phelan, 162 F.2d 663, 664 (9th Cir. 1947), rev'd on

---

[16]The venerable decision of this circuit court of appeals in United States v. O'Rourke, 213 F.2d 759, 762 (8th Cir. 1954), asserts that "there can be nothing more depraved or morally indefensible than conscious participation in the illicit drug traffic," such that drug trafficking offenses would always necessarily involve moral turpitude. However, drug trafficking offenses figure little in the question of what crimes constitute crimes involving moral turpitude. Drug use and trafficking provided an independent ground for deportation under former 8 U.S.C. § 1251(a)(11), and do so now under 8 U.S.C. § 1251(a)(2)(B).

other grounds, 333 U.S. 6 (1948)); In re Johnson, 822 P.2d 1317 (Cal. 1992); Burleigh v. State Bar of Nevada, 643 P.2d 1201, 1204 (Nev. 1982); State v. Lee, 404 S.W.2d 740, 748 (Mo. 1966); In re Noble, 423 P.2d 984, 984 (N.M. 1967). Courts have also consistently held that voluntary manslaughter is a crime involving moral turpitude. See, e.g., Vincent v. State, 442 S.E.2d 748, 749 (Ga. 1994) (impeachment with conviction of crime involving moral turpitude based on voluntary manslaughter conviction was proper, but exceeded proper scope when prosecutor explored facts of conviction); Harris v. Deafenbaugh, Slip. Op., No. CV91-0320379, 1993 WL 407983, *1 (Conn. Super. Ct. Sept. 30, 1993) (murder and voluntary manslaughter are crimes involving moral turpitude, citing Drazen v. New Haven Taxicab Co., 95 Conn. 500, 507 (1920)); People v. Gutierrez, 18 Cal. Rptr. 2d 371, 376 (Cal. Ct. App. 1993) (voluntary manslaughter is crime involving moral turpitude for purposes of impeaching witness); People v. Ballard, 16 Cal. Rptr. 2d 624, 628 (Cal. Ct. App. 1993) (parties conceded conviction for voluntary manslaughter was conviction of crime involving moral turpitude); People v. Von Villas, 15 Cal. Rptr. 2d 112, 143 (Cal. Ct. App. 1992) (same conclusion, but such conviction may not be useable for impeachment of witness for other reasons), cert. denied, ___ U.S. ___, 114 S. Ct. 118 (1993); People v. Foster, 246 Cal. Rptr. 855, 857 (Cal. Ct. App. 1988) (voluntary manslaughter is crime involving moral turpitude for purposes of witness impeachment); In re Strick, 738 P.2d 743, 750 (Cal. 1987) (circumstances surrounding attorney's conviction for voluntary manslaughter and assault with a deadly weapon exhibited moral turpitude as a matter of law in attorney discipline case); People v. Partner, 225 Cal. Rptr. 502, 506 (Cal. Ct. App. 1986) (voluntary manslaughter is crime involving moral turpitude for purposes of impeachment of witness); People v. Parrish, 217 Cal. Rptr. 700, 709 (Cal. Ct. App. 1985) (same, but stating that discussion applied only to voluntary manslaughter, despite defendant's arguments, which had principally involved involuntary manslaughter); but see Mitchell v. State, 379 S.E.2d 123, 125 (S.C. 1989) (voluntary

manslaughter under South Carolina law, and therefore like offense with same elements under New York law, are <u>not</u> crimes involving moral turpitude for purposes of impeaching a witness); <u>In re Mostman</u>, 765 P.2d 448, 454 (Cal. 1989) (in attorney discipline case, court read its precedent as holding that voluntary manslaughter is not necessarily a crime involving moral turpitude, citing <u>In re Strick</u>, 738 P.2d 743, 750 (Cal. 1987), and <u>In re Nevill</u>, 704 P.2d 1332 (Cal. 1985)); <u>People v. Thomas</u>, 254 Cal. Rptr. 15, 19 (Cal. Ct. App. 1988) (in considering impeachment with conviction for assault with a deadly weapon, court discussed, but did not decide, question of whether "imperfect self-defense" should call into doubt whether voluntary manslaughter necessarily involves moral turpitude); <u>State v. Morgan</u>, 541 S.W.2d 385, 390 (Tenn. 1976) (concluding that voluntary manslaughter was not "infamous crime" under Tennessee statute allowing use of "infamous crimes," to be used to impeach credibility, but not deciding whether such a crime was one involving moral turpitude, finding issue of fact to be settled on remand as to whether conviction was too remote to be used in any event).

Yet, the question presented here is whether the crime of <u>involuntary</u> manslaughter is also a crime universally recognized as a "crime involving moral turpitude." A merely anecdotal survey of court decisions, many of which involve impeachment of witnesses, would suggest that a conviction for involuntary manslaughter is not such a crime, because of the lack of any intent, let alone an "evil intent." <u>See, e.g.,</u> <u>United States ex rel. Mongiovi v. Karnuth</u>, 30 F.2d 825 (W.D.N.Y. 1929) (involuntary manslaughter does not involve moral turpitude); <u>Carreker v. State</u>, No. CR-93-2858, Slip Op., 1994 WL 620880 (Ala. Crim. App. 1994) (holding that involuntary manslaughter, defined either as reckless or negligent, was not a crime of moral turpitude, because it was "based on unintentional conduct, in contrast to those crimes involving some form of evil intent. It is not an offense that is mala in se and, thus, does not fall within the definition of crimes involving moral

turpitude."); <u>Matter of Frascinella</u>, 1 Cal. State Bar Ct. Rptr. 543, 1991 WL 94403, *5 (Cal. Bar Ct. 1991) (recognizing involuntary manslaughter as an offense that does not in and of itself constitute a crime involving moral turpitude for purposes of attorney disbarment); <u>In re Strick</u>, 738 P.2d 743, 750 (Cal. 1987)(involuntary manslaughter is not a crime necessarily involving moral turpitude for purposes of attorney disbarment); <u>People v. Montilla</u>, 513 N.Y.S.2d 338 (N.Y. Sup. Ct. 1987) (vehicular manslaughter is not a crime involving moral turpitude because it did not involve evil intent, but crime was defined in terms of criminal negligence, even though court considered precedents to establish rule that reckless manslaughter did not involve moral turpitude); <u>People v. Coad</u>, 226 Cal. Rptr. 386 (Cal. Ct. App. 1986) (voluntary manslaughter always involves intent to do evil, and hence involves moral turpitude, citing federal INS cases in which involuntary manslaughter was held not to involve moral turpitude); <u>People v. Solis</u>, 218 Cal. Rptr. 469 (Cal. Ct. App. 1985) (involuntary manslaughter is not a crime involving moral turpitude); <u>Abbey v. Lord</u>, 336 P.2d 226, 231 (Cal. Dist. Ct. App. 1959) (in deciding whether causing death of insured barred payment of insurance proceeds to beneficiary, court noted that involuntary manslaughter "does not involve the same kind of moral turpitude present in a voluntary killing"); <u>see also</u> <u>People v. Ford</u>, 597 N.Y.S.2d 882 (N.Y. Sup. Ct. 1993) (where person who pleaded guilty to reckless manslaughter sought to have trial judge reduce plea to negligent homicide so that person could avoid deportation for conviction of a crime involving moral turpitude, the court held jury should decide if crime involved moral turpitude, and set aside plea for trial by jury); <u>Kentucky Bar Ass'n v. Jones</u>, 759 S.W.2d 61 (Ky. 1988) (it was not necessary for court to determine if reckless homicide was a crime of moral turpitude, because it was conduct inappropriate of an attorney allowing suspension of license); <u>People v. Cazares</u>, 235 Cal. Rptr. 604, 605-06 (Cal. Ct. App. 1987) (trial court could properly deny probation on the ground that unusual circumstances were absent in conviction for involuntary

manslaughter, because firing a loaded weapon into a crowded dance hall was "acting with a depraved heart and with reckless abandon," even if crime did not involve moral turpitude, because of the lack of intent or malice); In re Morris, 397 P.2d 475, 478 (N.M. 1965) (court need not decide whether conviction for involuntary manslaughter rendered attorney unfit to practice law on ground of conviction of crime involving moral turpitude, because involuntary manslaughter as the result of driving under the influence of alcohol otherwise supported suspension of attorney's license); State Bd. of Medical Examiners v. Weiner, 172 A.2d 661, 670 (N.J. Super. Ct. App. Div. 1961) (refusing to foreclose the possibility that manslaughter, even involuntary manslaughter, was crime that did not involve moral turpitude for purposes of suspending license to practice medicine); In re Welansky, 65 N.E.2d 202 (Mass. 1946) (court need not consider whether involuntary manslaughter was crime involving moral turpitude or otherwise indicating unfitness to practice law where attorney offered no evidence that crime of which he was convicted was not one that disclosed his unfitness to remain at the bar).[17]

---

[17]These cases demonstrate that under the common law, involuntary manslaughter was consistently viewed as not being a crime involving moral turpitude, and commentators agree. See, e.g., Tarik H. Sultan, Immigration Consequences Of Criminal Convictions, ARIZ. ATT'Y 15 (June 30, 1994) ("[T]he following crimes do not generally involve moral turpitude: involuntary manslaughter, simple assault and battery, attempted suicide, libel, riot, vagrancy, maintaining a nuisance, fornication or Mann Act violations, breaking and entering or unlawful entry, possession of stolen property, joyriding, damaging private property, failure to report for induction, conspiracy to commit offenses against the United States, desertion, false statements not amounting to perjury, and violation of regulatory laws such as gambling or drunk driving."); Robert D. Ahlgren, State Dep't Implementation Of The 1990 Act: Grounds Of Exclusion Related To Criminal Activity, 422 PRAC. LAW INST./LIT & ADMIN. PRAC. COURSE HANDBOOK SERIES 165 (1991) ("[A] [crime involving moral turpitude] is any crime showing an innate "moral depravity." This can include anything from shoplifting to murder, but would not include, for example, a fistfight, drinking in a public place, or involuntary manslaughter."); Arthur C. Helton, Gaining Status For Your Client Under The Immigration Reform And Control Act Of 1986, 329 PRAC. LAW. INST./LIT. & ADMIN. PRAC. COURSE HANDBOOK SERIES 123 (1987) ("Moral turpitude is defined on a case by case basis. For example,

Prior to the decision in this case, the BIA itself made a distinction between voluntary manslaughter, which it invariably held was a crime involving moral turpitude, and involuntary manslaughter, which the BIA held was not such a crime. See Matter of Sanchez-Linn, Interim Dec. 3156 (BIA 1991) (voluntary manslaughter is a crime involving moral turpitude); Matter of Rosario, 15 I. & N. Dec. 416, 417 (BIA 1975) ("It is well settled that voluntary manslaughter—[defined as] an intentional killing of a human being—is a crime involving moral turpitude."); Matter of Ghunaim, 15 I. & N. Dec. 269, 270 (BIA 1975) ("Murder and voluntary manslaughter are crimes involving moral turpitude; involuntary manslaughter is not;" thus, immigration judge properly found conviction was for crime involving moral turpitude in the form of voluntary manslaughter where manslaughter statute included both voluntary and involuntary manslaughter, but record of conviction revealed indictment for a voluntary murder, and a necessary element of involuntary manslaughter, unintentional killing while in the commission of some unlawful act, was missing); Matter of Lopez, 13 I. & N. Dec. 725, 726-27 (BIA 1971) (finding no moral turpitude where statute did not distinguish between voluntary and involuntary manslaughter and indictment did not reveal intent); Matter of Ptasi, 12 I. & N. Dec. 790 (BIA 1968) (conviction of manslaughter by stabbing was conviction of crime involving moral turpitude); Matter of Sanchez-Marin, 11 I. & N. Dec. 264, 266 (BIA 1965) ("Voluntary manslaughter has generally been held to involve moral turpitude while involuntary manslaughter has not," but where alien indicted for second degree murder pleaded guilty to lesser offense

---

murder, voluntary manslaughter and assault with intent to kill involve moral turpitude, while involuntary manslaughter, assault and battery and simple possession of weapon do not."); Noah Kinigstein, Strategies For Ameliorating The Immigration Consequences Of Criminal Convictions: A Guide For Defense Attorneys, 23 AM. CRIM. L. REV. 425, 434 (Spring 1986) ("Crimes that have been held not to involve moral turpitude include: involuntary manslaughter, simple assault, and attempted suicide.").

of manslaughter under statute that did not distinguish between voluntary and involuntary manslaughter, it was "reasonable" to conclude alien had pleaded guilty to voluntary homicide, which is a crime involving moral turpitude); Matter of Abi-Rached, 10 I. & N. Dec. 551 (BIA 1964) (voluntary manslaughter was crime involving moral turpitude); Matter of Szegedi, 10 I. & N. Dec. 28, 34 (BIA 1962) (finding that involuntary manslaughter, defined as "homicide by reckless conduct," and defining mens rea as "grossly negligent conduct," did not involve moral turpitude because the intent element was not present); Matter of S, 9 I. & N. Dec. 496 (BIA 1961) (conviction under Peruvian statute was analogous to conviction of voluntary manslaughter in the United States, and therefore was conviction for crime involving moral turpitude); Matter of P, 6 I. & N. Dec. 788 (BIA 1955) (citing prior cases holding that voluntary manslaughter is a crime involving moral turpitude and so holding); Matter of R, 5 I. & N. Dec. 463 (BIA 1953) (where indictment charged voluntary killing, guilty plea under statute that makes no distinction between voluntary and involuntary manslaughter was conviction for crime involving moral turpitude); Matter of H R, 4 I. & N. Dec. 742 (BIA 1952) (in absence of evidence in record of conviction indicating involuntary nature of crime, manslaughter under statute making no distinction was deemed to be voluntary, and therefore a crime involving moral turpitude);[18] Matter of K, 4 I. & N. Dec. 108 (BIA 1951) (where neither statute nor conviction record make clear whether conviction was for voluntary or involuntary manslaughter, board cannot conclude that conviction under statute making no distinction is for crime involving moral turpitude); Matter of D, 3 I. & N. Dec. 51 (BIA 1947) (where statute does not distinguish between voluntary and involuntary manslaughter, but indictment is for homicide committed by means of an assault with malice aforethought,

---

[18]In my opinion, it would be improper to "deem" a crime to be one necessarily involving moral turpitude where the statute under which the alien has been convicted does not make this distinction, at least where the indictment makes no such distinction either.

conviction is for voluntary manslaughter, and hence involves moral turpitude); Matter of J, 2 I. & N. Dec. 477 (BIA 1947); Matter of N, 1 I. & N. Dec. 181 (BIA 1947) (involuntary manslaughter is not crime involving moral turpitude); Matter of S, 1 I. & N. Dec. 519 (BIA 1947) (voluntary manslaughter is crime involving moral turpitude). Thus, on a purely "anecdotal" basis, this should have been an "easy case," and the result should have been contrary to the BIA's decision below.

The INS argues that a change from its prior interpretations of the meaning of "crime involving moral turpitude" does not necessarily make the new interpretation unreasonable, citing Rust v. Sullivan, 500 U.S. 173, 186 (1991) ("An initial agency interpretation is not instantly carved in stone. . . . This Court has rejected the argument that an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretations' of the statute in question," quoting Chevron, 467 U.S. at 862); Yanez-Popp v. INS, 998 F.2d 231, 235 (4th Cir. 1993) ("[t]he Board has discretion to reinterpret the INA if it employs a 'reasoned analysis'"); Sussex Eng'g, Ltd. v. Montgomery, 825 F.2d 1084, 1088 (6th Cir. 1987) (new agency interpretation still should be afforded deference even if it conflicts with agency's prior interpretation), cert. denied sub nom. E & S Design and Dev., Ltd. v. Montgomery, 485 U.S. 1008 (1988). However, in Thomas Jefferson Univ. v. Shalala, 512 U.S. ___, 114 S. Ct. 2381 (1994), the Supreme Court held that an inconsistent interpretation of a statutory provision by the agency is "'"entitled to considerably less deference" than a consistently held agency view.'" Thomas Jefferson Univ., 512 U.S. at ___-___, 114 S. Ct. at 2392-94 (1994) (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30, 107 S. Ct. 1207, 1221 n.30 (1987), in turn quoting Watt v. Alaska, 451 U.S. 259, 273, 101 S. Ct. 1673, 1681 (1981)). That rule is only inapplicable when the party challenging the current interpretation has failed to present persuasive evidence that the agency has interpreted the statutory provision in

an inconsistent manner.  <u>Id.</u> at ___, 114 S. Ct. at 2388.  In this case, the inconsistency with prior BIA determinations that involuntary manslaughter is not a crime involving moral turpitude is more than adequately demonstrated.

Furthermore, the "new" interpretation here is not merely a change of interpretation of statutory language, but a reinterpretation of language with a long history of application and interpretation in the statutes and common law of this country.  Here, the BIA's new interpretation of "crimes involving moral turpitude" as including involuntary manslaughter is against the entire weight of the common law and the interpretations of the phrase by the courts of this country, as well as contrary to the BIA's prior interpretations.  On that basis alone, I do not find the BIA's change of interpretation reasonable.

Nor do I find the requisite "reasoned analysis" that might sustain a new interpretation of a statute even where it is contrary to prior agency interpretations.  <u>Yanez-Popp v. INS</u>, 998 F.2d at 235.  The BIA's analysis below consists of the following:

> In <u>Matter of Median</u>, 15 I. & N. Dec. 611 (BIA 1976), <u>aff'd sub nom. Medina-Luna v. INA</u>, 547 F.2d 1171 (7th Cir. 1977), the Board revisited the issue of whether criminally reckless conduct constituted a crime involving moral turpitude.  In <u>Medina</u>, the alien had been convicted of aggravated assault in violation of Illinois law.  Holding that the criminally reckless conduct defined by the Illinois "recklessness" statute provided the basis for a finding of moral turpitude, the Board construed the statute as follows:
>> The person acting recklessly must <u>consciously</u> disregard a <u>substantial and unjustifiable</u> risk, and such disregard must constitute a <u>gross</u> deviation from the standard of care which a reasonable person would exercise in the situation.  This definition of recklessness requires an actual awareness of the risk created by the criminal violator's action.  While the Illinois recklessness statute may not

-46-

> require a specific intent to cause
> a particular harm, the violator
> must show a willingness to commit
> the act in disregard of the
> perceived risk. The presence or
> absence of a corrupt or vicious
> mind is not controlling.
>
> Id. at 613-14.
>
> Later, in Matter of Wojtkow, [18 I. & N.
> Dec. 111 (BIA 1981)], the Board relied upon
> the holding in Medina to conclude that an
> alien's conviction for second degree
> manslaughter under the New York Penal Law
> constituted a crime involving moral turpitude.
> Quoting the New York statute, the Board noted
> that a person is guilty of second degree
> manslaughter in New York if "'he recklessly
> causes the death of another person.'" Matter
> of Wojtkow, supra, at 112 n.1. The Board
> further observed that the definition of
> "recklessness" under New York law was the same
> as the definition under Illinois law that had
> been analyzed in Medina. Id. at 112-13.

Matter of Franklin, Interim Dec. (BIA) 3228, Slip. op., pp. 3-4. Rejecting all prior precedent to the contrary, the BIA found these two decisions sufficient to find involuntary manslaughter based on reckless conduct to be a crime involving moral turpitude.


The authority upon which the BIA relied in this case, however, suffers from its own fatal deficiencies. As the BIA noted in its opinion below, the decision in Wojtkow relies upon that in Medina. Indeed, I find no analysis at all in the Wojtkow decision except a parroting of the conclusions of the Medina court. Wojtkow, 18 I. & N. Dec. at 112-13. The decision in Medina had been based upon an Illinois statute and the Wojtkow Board simply applied the Medina Board's conclusions to a New York statute framed in similar language. Id. In Medina, the BIA stated that "we have reconsidered the general position taken in [prior] cases, and we have concluded that moral turpitude can lie in criminally reckless conduct." Medina, 15 I. & N. Dec. 611 (BIA 1976). The extent of the Medina Board's analysis is the following:

> The person acting recklessly must consciously
> disregard a substantial and unjustifiable

> risk, and such disregard must constitute a gross deviation from the standard of care which a reasonable person would exercise in the situation. This definition of recklessness requires an actual awareness of the risk created by the criminal violator's action. While the Illinois recklessness statute may not require a specific intent to cause a particular harm, the violator must show a willingness to commit the act in disregard of the perceived risk. The presence or absence of a corrupt or vicious mind is not controlling. <u>Guerrero de Nodahl v. INS</u>, 407 F.2d 1405 ([9th Cir.] 1969). We hold that the criminally reckless conduct defined by [the Illinois statute] be [sic] the basis for a finding of moral turpitude.

<u>Medina</u>, 15 I. & N. Dec. 611 (also rejecting assertions that an "infamous crime" is synonymous with "crime involving moral turpitude"). I find that the <u>Medina</u> decision gives no explanation or analysis to support its conclusion that willingness to commit an act in disregard of a perceived risk is moral turpitude, because that decision does not consider the relationship of willingness to commit the act to an evil intent or any other <u>necessary</u> element of moral turpitude. It asserts only that willingness to commit an act does not equate with a corrupt or vicious mind, but that the lack of a corrupt or vicious mind is not dispositive of the question of whether a crime involves moral turpitude. Nor does the BIA consider in <u>Medina</u> whether its reading of the statute bears any relationship to the reading given the statute by the state's highest court, the body properly charged with interpreting the laws of the state.

Furthermore, the BIA's decision in this case is against the far greater weight of precedent. As the state and federal court decisions cited in this section indicate, most courts require an evil intent element or, at the very least, a knowledge element, for a crime to be one that involves moral turpitude. Additional examples of decisions so holding are <u>Wadman v. INS</u>, 329 F.2d 812 (9th Cir. 1964) (requirement of knowledge that items were stolen

was sufficient to involve moral turpitude); <u>People v. Coad</u>, 226 Cal. Rptr. 386 (Cal. Ct. App. 1986) (intent to do evil is required to find moral turpitude, and intent to do evil is always involved in the <u>intentional</u> taking of a human life); <u>In re Conduct of Chase</u>, 702 P.2d 1082 (Or. 1985) (finding that federal cases are in agreement that moral turpitude requires an intentional mental state).  Only a few cases specifically consider whether recklessness suffices to show moral turpitude.  <u>Compare</u> <u>In re Wilkins</u>, 649 A.2d 557 (D.C. App. 1994) ("recklessness" may satisfy intent element of offense, but is insufficient to find moral turpitude within meaning of attorney disciplinary rule, because "recklessness" won't "stand in for" the specific intent required to find moral turpitude); <u>Willis v. State</u>, No. B14-89-00215-CR, 1989 WL 156268 (Tex. Ct. App. Dec. 21, 1989)(not reported) (reckless conduct is not a crime of moral turpitude); <u>Patterson v. State</u>, 783 S.W.2d 268 (Tex. Ct. App. 1989) (companion to Willis) (reckless misdemeanor not involving violence towards women does not involve moral turpitude); <u>Ricketts v. State</u>, 436 A.2d 906 (Md. Ct. App. 1981) (crime is too unspecific to be one of moral turpitude where it includes within the definition acts that are reckless or negligent, for purposes of impeachment of a witness); <u>with</u> <u>Gutierrez-Chavez v. INS</u>, 8 F.3d 26 (Table), 1993 WL 394916 (9th Cir. 1993) (recklessly receiving a stolen gun, second degree theft, was crime involving moral turpitude under Alaska statute interpreted by Alaska courts to contain both "an element of guilty knowledge and an implied element of intent to deprive the owner of property which has been stolen,"); <u>People v. Campbell</u>, 28 Cal. Rptr. 2d 716 (Cal. Ct. App. 1994) (definition of "maliciously" as "wanton and wilful (or 'reckless') disregard of the plain dangers of harm, without justification, excuse, or mitigation," exceeding "mere intentional harm," can show the state of mind that betokens a "general readiness to do evil," which constitutes moral turpitude).  Courts have therefore only rarely parlayed "recklessness" into the "evil intent" required to find that a crime involves moral turpitude.  In the cases where courts did so, the

courts found that the governing statute had been interpreted by the state's highest courts to include at least an implied "evil intent" element.  The BIA here undertook no such analysis of Missouri law.  Thus, I find no "reasoned basis" either for the BIA's determination that recklessness can suffice to make a crime one involving moral turpitude, nor for finding that "recklessness" as defined under Missouri law can be parlayed into an element of guilty knowledge or implied intent that could be acknowledged to imbue a crime with moral turpitude.

In part because of the BIA's change of direction from these precedents in this case, I deem it essential, in deciding the reasonableness of the BIA's new position, to move beyond an anecdotal determination of what is a "crime involving moral turpitude," and instead attempt to find a concrete meaning for the phrase.  However, I find that such a quest has rarely been made, and even more rarely has reached its objective.

### D.  The Lack Of A Concrete Meaning

Despite the copious number of decisions addressing whether or not certain categories of crimes are or are not "crimes involving moral turpitude," the courts have rarely been able to strike upon a concrete meaning of the phrase.  For example, the Supreme Court in <u>Jordan</u> had no difficulty in finding that a crime with an element of fraud was a "crime involving moral turpitude," because of a substantial body of precedent so holding.  <u>Jordan</u>, 341 U.S. at 227-29. However, when asked to decide whether the phrase "crime involving moral turpitude" in the deportation statute was "void for vagueness," the Court pulled what I must respectfully suggest was an intellectual sleight of hand.  <u>See</u> <u>Id.</u> at 230-32.

The Court first acknowledged that deportation is a drastic measure, then recognized that the purpose of the "void for vagueness" doctrine was to ensure that criminal statutes placed persons on notice of the consequences of their conduct.  <u>Id.</u> at

230-31. Thus, the Court found, the test was "whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." Id. at 231-32 (citing Connally v. General Constr. Co., 269 U.S. 385 (1926), for this test). However, rather than grappling with whether the phrase "crime involving moral turpitude" conveyed any definite warning at all, the Court again referred to precedent:

> Whatever else the phrase "crime involving moral turpitude" may mean in peripheral cases, the decided cases make it plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude. We have recently stated that doubt as to the adequacy of a standard in less obvious cases does not render that standard unconstitutional for vagueness. See Williams v. United States, [341 U.S. 97 (1951)]. But there is no such doubt present in this case. Fraud is the touchstone by which this case should be judged. The phrase "crime involving moral turpitude" has without exception been construed to embrace fraudulent conduct. We therefore decide that Congress sufficiently forewarned respondent that the statutory consequence of twice conspiring to defraud the United States is deportation.

Id. at 232. Herein lies the Court's sleight of hand: the phrase "crime involving moral turpitude" had a concrete meaning and conveyed sufficiently definite warning in the Jordan case only because courts had always held that the kind of crime in question fits the standard, whatever that standard may mean. Thus, as long as a case requires the court to tread only the familiar territory of well-cultivated precedent, the phrase "crime involving moral turpitude" provides no uncomfortable uncertainty.[19] But I

---

[19]Although "vagueness" is not an issue here, and I present the "vagueness" conclusions of the Jordan Court only to demonstrate that courts are most comfortable in examining "moral turpitude" when they are not required to stray far from the beaten path, I am not persuaded that the Jordan majority's "vagueness" argument is enhanced by one of the grounds on which it is based. The Court opined that "[t]he phrase 'crime involving moral turpitude' presents no greater uncertainty or difficulty than language found in many other statutes repeatedly sanctioned by the Court." Jordan, 341 U.S. at 231 n.15 (identifying, inter alia, "restraint of trade" in the Sherman Act). Comparative uncertainty isn't the

-51-

repeat,

---

standard for "vagueness"; due notice of consequences, by the Court's own statement, is the applicable standard. <u>Id.</u> at 231-32 (citing <u>Connally</u>, 269 U.S. at 385).

this is not such a case. Rather, this is one of those uncomfortable "peripheral" or "less obvious" cases in which the standard, even if its adequacy were free from doubt, id., is plainly of dubious certainty in its application. Does the phrase convey any definite warning that the conduct in question here would fall within the standard? More importantly, since "vagueness" is not the issue here, is anyone, including the BIA, able to define the meaning of the phrase, and is the BIA's definition reasonable, or merely capricious?

The dissenting justices in Jordan recognized that these very questions were unresolved. In a stinging dissent, Justice Jackson, writing for himself and Justices Black and Frankfurter, described an alien who is deported for conviction of one or more crimes involving moral turpitude as being "punished with a life sentence of banishment in addition to the punishment which a citizen would suffer for the identical acts." Id. at 232 (Jackson, J., dissenting). The dissenting justices "believe[d] the phrase 'crime involving moral turpitude,' found in the Immigration Act, has no sufficiently definite meaning to be a constitutional standard for deportation." Id. (Jackson, J., dissenting). Justice Jackson found that "[w]hat the Government seeks, and what the Court cannot give, is a basic definition of 'moral turpitude' to guide administrators and lower courts." Id. "Except for the Court's opinion," Justice Jackson wrote, "there appears to be universal recognition that we have here an undefined and undefinable standard. The parties agree that the phrase is ambiguous and have proposed a variety of tests to reduce the abstract provision of this statute to some concrete meaning." Id. at 235. It is just

such a reduction to concrete meaning that is necessary in this case, involving as it does a case on the "periphery" of settled territory.  No reasonably concrete definition has been forthcoming in this case, but only what I find to be a capricious determination of the deportability of one person setting a dangerous precedent for anecdotal decision making.

Unlike the majority in Jordan, the dissenting justices attempted to find a concrete definition of the phrase "crime involving moral turpitude," rather than simply an anecdotal one.  Here, the dissenters were frustrated:

> [T]he phrase "crime involving moral turpitude" . . . is not one which has settled significance from being words of art in the profession.  If we go to the dictionaries, the last resort of the baffled judge, we learn little except that the expression is redundant, for turpitude alone means moral wickedness or depravity and moral turpitude seems to mean little more than morally immoral.  The Government confesses that it is "a term that is not clearly defined," and says:  "the various definitions of moral turpitude provide no exact test by which we can classify the specific offenses here involved."

Jordan, 341 U.S. at 234-35 (Jackson, J., dissenting).[20]  After reviewing attempts to define the phrase in administrative and judicial decisions, the frustrated dissenters threw up their hands:

> The lower court cases seem to rest, as we feel this Court's decision does, upon the moral reactions of particular judges to particular

_____

[20]The baffled dissenting justices turned to the edition of Black's Law Dictionary current at the time to find "turpitude" defined as "[I]nherent baseness or vileness of principle or action; shameful wickedness; depravity," and to Bouvier's Law Dictionary, Rawles Third Revision, in which "moral turpitude" was defined as "An act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man."  Jordan, 341 U.S. at 234 n.6 & n.7 (Jackson, J., dissenting).

offenses. What is striking about the opinions in these "moral turpitude" cases is the wearisome repetition of clichés attempting to define "moral turpitude," usually a quotation from Bouvier. But the guiding line seems to have no relation to the result reached. The chief impression from the cases is the caprice of the judgments.

Id. at 239 (Jackson, J., dissenting) (emphasis added).[21] As both my statement of the standard of review and that of the majority indicate, "moral reactions of particular judges to particular offenses" is not a proper basis for determining whether any particular crime is or is not one in which moral turpitude necessarily inheres; rather, the court must decide the question of whether the alien has been convicted of a crime involving moral turpitude based on a categorical assessment of the crime of conviction, not the facts of the particular case. See, e.g., Ramsey, 55 F.3d at 583 (BIA and court must look to nature of crime, not facts of the particular case); Rodriguez-Herrera, 52 F.3d at 239-40; Gonzalez-Alvarado, 39 F.3d at 246; Reyes-Castro, 13 F.3d at 379; Goldeshtein, 8 F.3d at 647; McNaughton, 612 F.2d at 459; Robinson, 51 F.2d at 1022-23. To what dictionary or other source did the INS turn to discover its meaning for a "crime involving moral turpitude," and, more importantly, to what dictionary or other source did the INS turn in concocting a meaning for the phrase that encompassed reckless conduct? How universal is the definition upon which the INS has struck? How reasonable? Is that definition the result of the "caprice" the Jordan dissenters found so prevalent in "moral turpitude" cases? I will consider these questions below.

---

[21]The reference in the preceding quotation to Bouvier is to the definition found in Bouvier's Law Dictionary, Rawles Third Revision, which the Jordan dissenters had previously cited and which is quoted herein in footnote 20 supra.

E.   Reasonableness In The Light Of A Concrete Meaning

In this case, the INS employed a definition of a crime involving moral turpitude as a crime involving "conduct which is inherently base, vile, or depraved, and contrary to the accepted rules of morality and duties owed between persons or to society in general."  I acknowledge that the definition of "crime involving moral turpitude" employed by the INS is used with remarkable consistency.  See, e.g., Rodriquez-Herrera v. INS, 52 F.3d 238, 239 (9th Cir. 1995) (whether a crime is one involving moral turpitude depends on whether crime is one that "necessarily involves an 'act of baseness or depravity contrary to accepted moral standards,'" quoting Grageda v. INS, 12 F.3d 919, 921 (9th Cir. 1993), in turn quoting Guerrero de Nodahl v. INS, 407 F.2d 1405, 1406 (9th Cir. 1969)); Grageda v. INS, 12 F.3d 919, 921 (9th Cir. 1993); Guerrero de Nodahl v. INS, 407 F.2d 1405, 1406 (9th Cir. 1969); and compare Hunter, 471 U.S. at 226 (Alabama Supreme Court's definition of "crime involving moral turpitude" in the Alabama constitutional provision disqualifying voters convicted of such crimes was "an act that is '"immoral in itself, regardless of the fact whether it is punishable by law.  The doing of the act itself, and not its prohibition by statute[,] fixes the moral turpitude,"'" quoting Pippin v. State, 73 So. 340, 342 (Ala. 1916), in turn quoting Fort v. Brinkley, 112 S.W. 1084 (Ark. 1908)).  Hence, whatever dictionary the INS used to select such a definition, it was in good company, and my disagreement with the majority and with the INS does not lie in the words they have used to define "moral turpitude."  Rather, my disagreement lies in the reach given that definition by both the majority and the INS, in the first instance, to include criminally reckless conduct within the ambit of crimes that necessarily involve moral turpitude, and, in the second instance, to include the crime, defined by Missouri law, of which Myrisia Franklin was convicted.

There are a few cases that attempt to develop a concrete definition of what is a crime involving moral turpitude by looking

at the elements of this definition of moral turpitude or by drawing from the crimes universally recognized as involving moral turpitude those characteristics that define the general class of "crimes involving moral turpitude." Among the most valiant of such efforts was that undertaken by the Ninth Circuit Court of Appeals in Rodriquez-Herrera v. INS, 52 F.3d 238 (9th Cir. 1995).

In Rodriquez-Herrera, the court tried to discover from the anecdotal decisions finding or not finding moral turpitude to inhere in certain categories of offenses some guiding principles or defining characteristics that could be used to recognize or classify certain crimes as involving moral turpitude. See Rodriquez-Herrera, 52 F.3d at 240-41. In other words, the court attempted to develop what might be called a "taxonomy" of moral turpitude.

The court in Rodriquez-Herrera discovered that
> [f]or crimes like malicious mischief that are not of the gravest character, a requirement of fraud has ordinarily been required. . . .
> On the other hand, certain crimes necessarily involving rather grave acts of baseness or depravity may qualify as crimes of moral turpitude even though they have no element of fraud. Applying this standard we have found that spousal abuse, child abuse, first-degree incest, and having carnal knowledge with a 15 year old female, all involve moral turpitude. . . .

Id. at 240 (citations omitted). Applying these principles, the court held that the Washington statute prohibiting malicious mischief did not define a crime involving moral turpitude. Id. Although the crime included an "evil intent" element in the form of "malice," it was a minor offense, including pranks resulting from poor judgment, that lacked either depravity or fraud, and therefore did not involve moral turpitude. Id. The INS resisted this conclusion, arguing that if a statute requires an "evil intent, wish, or design to vex, annoy, or injure another person," as the

Washington statute defining "malice" did, it defined a crime necessarily involving moral turpitude.  Id.  The court rejected this proposition:

> It is true that in the fraud context we have placed a great deal of weight on the requirement of an evil intent.  But even in this context, we have not held that if a statute requires evil intent, it necessarily involves moral turpitude.  We have held only that without an evil intent, a statute does not necessarily involve moral turpitude.  See Hirsch v. INS, 308 F.2d 562, 567 (9th Cir. 1962) ("A crime that does not necessarily involve evil intent, such as an intent to defraud, is not necessarily a crime involving moral turpitude.")  To state the proposition positively, we have held that in the fraud context an evil intent is necessary, but not sufficient, for a crime inevitably to involve moral turpitude.  Cf. Gonzalez-Alvarado [v. INS],39 F.3d [245,] 246 [(9th Cir. 1994)] (holding that "[a] crime involving the willful commission of a base or depraved act is a crime involving moral turpitude, whether or not the statute requires proof of evil intent.").

Id.  The Ninth Circuit Court of Appeals rejected the argument that all crimes requiring some degree of evil intent are necessarily crimes involving moral turpitude.  Id. at 241.  The court reasoned that

> evil intent may become much too attenuated to imbue the crime with the character of fraud or depravity that we have associated with moral turpitude.  At least outside of the fraud context, the bare presence of some degree of evil intent is not enough to convert a crime that is not serious into one of moral turpitude leading to deportation under [former] section 241(a)(4) of the Immigration and Nationality Act.

Id. (footnote omitted).  The court held that Washington's statutory definition of malicious mischief defined such a crime in which evil intent was "too attenuated" for the crime to be one that necessarily involved moral turpitude.  Id.  Therefore, an alien

-58-

convicted under the Washington malicious mischief statute was not deportable for conviction of a crime involving moral turpitude.  Id.

The classifying principles or taxonomy of moral turpitude as stated by the Ninth Circuit Court of Appeals in Rodriquez-Herrera may be distilled into the following propositions:  1) for minor crimes, an element of fraud has been required; 2) for fraud crimes, an element of evil intent, such as intent to defraud, is necessary, but not sufficient, to define a crime as one involving moral turpitude; 3) for serious crimes, an element of baseness or depravity suffices even if there is no explicit element of fraud or evil intent; 4) at least for minor crimes not involving fraud, evil intent may become too attenuated to meet the requirement of either fraud or depravity such that the crime necessarily involves moral turpitude.  Id. at 240-41.

Other cases, nearly all of them also decided by the Ninth Circuit Court of Appeals, in which the court attempted to develop a classification system for crimes that necessarily do or do not involve moral turpitude, have grappled with similar defining elements.  Notable among these decisions are two cited by the court in Rodriquez-Herrera.  See, e.g., Gonzalez-Alvarado v. INS, 39 F.3d 245 (9th Cir. 1994) (holding that "[a] crime involving the willful commission of a base or depraved act is a crime involving moral turpitude, whether or not the statute requires proof of evil intent."); Hirsch v. INS, 308 F.2d 562, 567 (9th Cir. 1962) ("A crime that does not necessarily involve evil intent, such as an intent to defraud, is not necessarily a crime involving moral turpitude.").  A theme running through all of these decisions is the relationship between evil intent and other elements of the crime as defining a crime involving moral turpitude.

For example, in Gonzalez-Alvarado v. INS, 39 F.3d 245 (9th Cir. 1994), a decision slightly earlier than Rodriquez-Herrera, the

Ninth Circuit Court of Appeals made a similar attempt to develop a classification system of crimes involving moral turpitude from its prior, anecdotal decisions:

> Typically, crimes of moral turpitude involve fraud. See Grageda v. U.S. INS, 12 F.3d 919, 921 (9th Cir. 1993); Goldeshtein, 8 F.3d at 647. However, we have included in this category acts "of baseness or depravity contrary to accepted moral standards," Grageda, 12 F.3d at 921 (quotation omitted), such as spousal abuse, child abuse, and statutory rape which involve moral turpitude "by their very nature." See id. at 922 (spousal abuse); Guerrero de Nodahl v. INS, 407 F.2d 1405, 1406-07 (9th Cir. 1969) (child abuse); Bendel v. Nagle, 17 F.2d 719, 720 (9th Cir. 1927) (statutory rape). Incest also involves an act of baseness or depravity contrary to accepted moral standards, and we hold that it too is a "crime involving moral turpitude." See also II American Law Institute, Model Penal Code and Commentaries § 230.2 cmt. 2(d), 406-07 (1980) (recognizing that laws against incest reinforce a community norm of "general and intense hostility" toward such conduct).

Gonzalez-Alvarado, 39 F.3d at 246. Taking a slightly different approach to the "evil intent" element from the later decision in Rodriquez-Herrera, the Ninth Circuit Court of Appeals in Gonzalez-Alvarado found that "[e]ven if evil intent is not explicit in the definition of [a crime under state law], we have held that 'a crime nevertheless may involve moral turpitude if such intent is implicit in the nature of the crime.'" Gonzalez-Alvarado, 39 F.3d at 246 (quoting Goldeshtein, 8 F.3d at 648). The court therefore concluded that "[a] crime involving a willful commission of a base or depraved act is a crime involving moral turpitude, whether or not the statute requires proof of evil intent." Id. (citing Grageda, 12 F.3d at 922, and Guerrero de Nodahl, 407 F.2d at 1407); see also Guerrero de Nodahl, 407 F.2d at 1407 (child beating is considered so heinous that "willful conduct and moral turpitude are synonymous"). Thus, rather than creating a separate category of crimes involving moral turpitude based on depravity or baseness

instead of evil intent, I read <u>Gonzalez-Alvarado</u> to hold that elements of baseness and depravity define a crime in which evil intent is implicit, even if evil intent is not separately and explicitly made an element of the offense. <u>Id.</u>; <u>Cf.</u> <u>Rodriquez-Herrera</u>, 52 F.3d at 240 ("[E]vil intent is necessary, but not sufficient, for a crime inevitably to involve moral turpitude.").

This reading is in accord with other decisions, none of which find a crime involves moral turpitude unless "evil intent" or "guilty knowledge" is a required element. <u>See</u> <u>Goldeshtein</u>, 8 F.3d at 648 (crime that does not necessarily involve evil intent is not necessarily a crime involving moral turpitude, citing <u>Hirsch</u>, 308 F.2d at 567); <u>Gutierrez-Chavez</u>, 8 F.3d at 26 (Table), 1993 WL 394916, at **3 (9th Cir. 1993) (referring to state case law to find guilty knowledge requirement implicit in definition of recklessly receiving stolen property); <u>Lennon v. INS</u>, 527 F.2d 187, 194 (2d Cir. 1975) (Congress would not have classified an alien as deportable if the crime of which the alien was convicted made guilty knowledge irrelevant); <u>Wadman</u>, 329 F.2d at 814 (where "guilty knowledge" is an essential element of a crime, moral turpitude is present); <u>Hirsch</u>, 308 F.2d at 567 (crime that does not necessarily involve evil intent is not necessarily a crime involving moral turpitude); <u>Matter of P</u>, 2 I. & N. Dec. 117, 121 (BIA 1944) ("it is in the intent that moral turpitude inheres."). Furthermore, decisions also hold that such an intent or knowledge element may be implicit rather than explicit. <u>Goldeshtein</u>, 8 F.3d at 648-49 (evil intent, in the form of intent to defraud, may be implicit rather than explicit, but no such implicit intent to defraud was apparent in particular offense, structuring currency transactions to avoid currency reports, at issue); <u>McNaughton</u>, 612 F.2d at 459 (evil intent element may appear from the statutory definition or the "nature of the crime"); <u>Winestock v. INS</u>, 576 F.2d 234, 235 (9th Cir. 1978) (evil intent, in the form of intent to defraud, may be "implicit in the nature of the crime," and thus the crime involves moral turpitude); <u>Matter of Flores</u>, 17 I. & N.

Dec. 225, 228 (BIA 1980) ("where fraud is inherent in an offense, it is not necessary that the statute prohibiting it include the usual phraseology concerning fraud in order for it to involve moral turpitude").

In Graqeda, the Ninth Circuit Court of Appeals focused on another element in the definition of the crime, this time "willfulness," and its relationship to baseness and depravity. Graqeda, 12 F.3d at 922. Because spousal abuse as defined under California law was an act of baseness or depravity contrary to accepted moral standards, and willfulness was one of its elements, the court held that spousal abuse was a "crime involving moral turpitude." Id. The appellant argued that such a conclusion equated conduct done "willfully" with moral turpitude. Id. The court, however, found that

> the term 'willfully' does not constitute moral turpitude. Rather, it is the combination of the base or depraved act and the willfulness of the action that makes the crime one of moral turpitude.

Id. The court suggested that it was the willfulness of the injurious conduct to one committed to a relationship of trust that, in part, made the act of spousal abuse base and depraved. Id.; see also Goldeshtein, 8 F.3d at 648 (proof that defendant acted "willfully" is not the same as proving the "evil intent" required for a "crime involving moral turpitude" in a deportation case; "'"wilful" means no more than that the forbidden act is done deliberately and with knowledge,'" quoting Hirsch, 308 F.2d at 566, in turn quoting Neely v. United States, 300 F.2d 67, 72 (9th Cir.), cert. denied, 369 U.S. 864 (1962)).[22]

---

[22]Another variant on the mental state required for a crime to be one necessarily involving moral turpitude is the "corrupt mind" element. See, e.g., Okabe v. INS, 671 F.2d 863, 865 (5th Cir. 1982) ("Offering a bribe under this statute [18 U.S.C. § 201(b)(3)] is a crime involving moral turpitude, for a corrupt mind is an essential element of the offense."). Thus, a "corrupt mind" is sufficient, but not necessary, for a crime to involve moral turpitude. See Medina, 15 I. & N. Dec. 611 (citing Guerrero de Nodahl, 407 F.2d at 1405, for the proposition that presence or absence of a corrupt or vicious mind is not controlling).

Thus, in light of these cases, the classification system I believe is applicable to the question of whether or not a crime as defined is one in which moral turpitude necessarily inheres is as follows: 1) "evil intent," either explicit or implicit, is necessary, but not sufficient to define a crime as one necessarily involving moral turpitude; 2) for relatively minor crimes, mere "evil intent" may become too attenuated to define a crime in which moral turpitude necessarily inheres; 3) baseness and depravity, while not necessary, are always sufficient to define a crime as one involving moral turpitude, because implicit in such crimes is the necessary "evil intent" as well as sufficient moral obliquity contrary to accepted moral standards.

This taxonomy of moral turpitude accords with the substantial weight of authority defining the phrase "crime involving moral turpitude" in merely anecdotal fashion. Thus, under this taxonomy of moral turpitude, fraud crimes will always be crimes involving moral turpitude, Jordan, 341 U.S. at 232; Izedonmwen, 37 F.3d at 417, because they have the requisite "evil intent," in the form of intent to defraud, which is never too attenuated to remove the crime from the realm of "crimes involving moral turpitude." Rape, and even statutory rape, which has no intent requirement, would be crimes involving moral turpitude under this classification system, because such crimes are base and depraved, and therefore "manifestly involve[] moral turpitude." See, e.g., Marciano, 450 F.2d at 1025. Similarly, theft crimes would always be recognized as crimes involving moral turpitude, see, e.g., Dashto, 59 F.3d at 699; Soetarto, 516 F.2d at 780; Villa-Fabela, 882 F.2d at 440; Chiaramonte, 626 F.2d at 1097; Christianson, 226 F.2d at 655; Berlandi, 113 F.2d at 431, because the intent to deprive another of property is an "evil intent" implicit in such crimes. Voluntary

homicide, defined as either murder or voluntary manslaughter, remains a crime involving moral turpitude, because it involves an "evil intent," at the very least, if not baseness and depravity.  See, e.g., Cabral, 15 F.3d at 195-96.

But what of criminally reckless conduct, such as reckless theft or involuntary manslaughter?  As noted above, the vast majority of decisions find reckless or involuntary conduct does not fit the paradigm.  However, we must be most concerned with cases that appear to depart from, not merely confirm, an anticipated result.  Such cases require careful analysis to see if they fit the paradigm offered here after all.

One case at first blush appears to define reckless conduct as defining conduct imbuing a crime with the essential elements of moral turpitude.  See People v. Campbell, 28 Cal. Rptr. 2d 716 (Cal. Ct. App. 1994).  In Campbell, however, the California Court of Appeals was determining whether a conviction for felony vandalism, which had a "malice" element, constituted a crime involving moral turpitude for purposes of impeachment of a witness.  Campbell, 28 Cal. Rptr. 2d at 719.  The court observed that, under California law, a witness may be impeached for conviction of a crime involving moral turpitude, where such a crime is defined by an element of "general readiness to do evil."  Id. (citing People v. Castro, 696 P.2d 111 (Cal. 1985)).  The court also noted the following:

> "It is generally held that [the term 'malice' in such statutes] calls for more than mere intentional harm without justification or excuse; there must be a wanton and wilful (or 'reckless') disregard of the plain dangers of harm, without justification, excuse or mitigation."  ([2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Property, § 678,] p. 762.)  Such a state of mind betokens that "general readiness to do evil" which constitutes moral turpitude. (See Castro, supra, 38 Cal. 3d at 314, 211 Cal. Rptr. 719, 38 Cal. 3d 301.)

Id. However, the California Court of Appeals specifically stated that immigration decisions, pressed by the defendant, did not apply the standards for a crime involving moral turpitude set forth in the Castro decision controlling on the state law question of impeachment of witnesses. Id. at 720. Furthermore, it is apparent from the quoted language that the "recklessness" in question in Campbell was "disregard" of the "dangers of harm, without justification, excuse or mitigation," exceeding a "mere intention" to harm the victim. Id. at 719. Thus, there is already an intent to harm present in Campbell's discussion of recklessness and moral turpitude; the recklessness involved is as to the dangers of the intended harm. Campbell therefore does not support the general proposition that recklessness can stand in for the evil intent element that is necessary for a crime to involve moral turpitude.

As a general matter, I find the California standard of "readiness to do evil" as defining a crime involving moral turpitude to be inadequate. To my mind, "readiness to do evil" does not necessarily imply intent to do evil. "Readiness" is a disposition, but "intent" is the formulation of a purpose. It is "evil intent," not readiness to have such an intent, in which moral turpitude necessarily inheres. However, the Campbell court noted that its "readiness to do evil" standard differed from that applied to a determination of crimes involving moral turpitude for immigration purposes, and therefore that standard, with what I would consider an unreasonable extension of the meaning of "crime involving moral turpitude," is simply inapplicable here. Finally, it is apparent that the Campbell court was actually looking at a mens rea that exceeded "mere intent," not one that fell short of intent. Thus, the Campbell court may have been addressing a crime in which more than the necessary elements of a crime involving moral turpitude were necessarily present.

In an unpublished decision, Gutierrez-Chavez v. INS, 8 F.3d 26 (Table), 1993 WL 394916 (9th Cir. 1993), the Ninth Circuit Court of

-65-

Appeals upheld the BIA's order of deportation of an alien, denying the alien's request for voluntary departure, where the alien had been convicted of a crime with only a "recklessness" mens rea. <u>Gutierrez-Chavez</u>, 8 F.3d at 26 (Table), 1993 WL 394916, at **1. In <u>Gutierrez-Chavez</u>, the alien had been convicted of second degree theft under Alaska statutes, Alaska Stat. §§ 11.46.130(a) & 11.46.190 (a), which had as an element of the offense proof that the defendant acted recklessly. <u>Id.</u> The court reviewed <u>de novo</u> the question of law of whether a conviction in Alaska for theft in the second degree is a crime involving moral turpitude. <u>Id.</u> The court recognized both that it had held that moral turpitude "is shown when evil motive or bad purpose is part of the crime," <u>Id.</u> (citing <u>Tseung Chu</u>, 247 F.2d at 934), and that "'theft[s] [are] crime[s] of moral turpitude.'" <u>Id.</u>, 1993 WL 394916, at **2 (quoting <u>Villa-Fabela</u>, 882 F.2d at 440). However, the court recognized that it had not previously reached the question of whether a theft conviction under a statute requiring only proof of recklessness would suffice to constitute a crime involving moral turpitude. <u>Id.</u>

Searching for the defining characteristics of a crime involving moral turpitude, the court inquired "whether the statute contains an element of guilty knowledge or evil intent." <u>Id.</u> (citing, <u>inter alia</u>, <u>Wadman</u>, 329 F.2d at 814.). Sifting through the applicable state statutes, the court found that second degree theft could include "theft by receiving," and that theft by receiving was in turn defined as buying, receiving, retaining, concealing, or disposing of stolen property "with reckless disregard that the property was stolen." <u>Id.</u> , 1993 WL 394916, at **3 (citing Alaska Stat. §§ 11.46.100(4) & 11.46.190 (a)). Alaska law defined "recklessness" in terms similar to those used in the Missouri statute at issue here:

> "[A] person acts "recklessly" with respect to
> a result or to a circumstance described by a
> provision of law defining an offense when the
> person is aware of and consciously disregards

a substantial and unjustifiable risk that the
result will occur or that the circumstance
exists; the risk must be of such a nature and
degree that disregard of it constitutes a
gross deviation from the standard of conduct
that a reasonable person would observe in the
situation. . . ."

Id. (quoting Alaska Stat. § 11.81.900(3)).

The court in Gutierrez-Chavez then performed the crucial step in the
analysis by carefully analyzing interpretations of the statutes in question
by the Alaska courts before concluding that "Alaska courts have interpreted
the theft by receiving statute to contain both an element of guilty
knowledge and an implied element of intent to deprive the owner of property
which has been stolen."  Id. (citing Andrew v. State, 653 P.2d 1063, 1065
(Alaska Ct. App. 1982).  The court concluded that "[u]nder Alaska's
interpretation of its theft by receiving statute, a conviction under the
statute suffices to meet the requirements of a crime involving moral
turpitude because guilty knowledge and evil intent are elements of the
crime."  Id.  The court noted that this conclusion was in accord with the
decisions in Matter of Wojtkow, 18 I. & N. Dec. 111 (BIA 1981), and Matter
of Medina, 15 I. & N. Dec. 611 (BIA 1976), which had found similar
statutory language defined a crime involving moral turpitude.  Id., 1993
WL 394916, at **4.  Thus, in Gutierrez-Chavez, the reviewing court looked
to state case law to determine whether the statutory language actually
defined a crime in which the essential elements of moral turpitude inhered,
and found from those state court decisions that the statute did define a
crime with those essential elements.

"Guilty knowledge" has been recognized as a minimum degree of
culpability for a crime to involve moral turpitude.  See,e.g., Lennon, 527
F.2d at 194; Wadman, 329 F.2d at 814.  When the state's highest court
interprets the elements of the crime as including "guilty knowledge"
coupled with implied intent to do a wrong or

evil act, as was the case in <u>Gutierrez-Chavez</u>, moral turpitude may well be present.  <u>See, e.g.,</u> <u>Goldeshtein</u>, 8 F.3d at 648 (crime that does not necessarily involve evil intent is not necessarily crime involving moral turpitude, citing <u>Hirsch</u>, 308 F.2d at 567).  It was not mere "recklessness" that provided the necessary elements of guilty knowledge and implied intent to do evil under the Alaska statute, but reckless <u>theft</u> in which such elements were implicit.  Theft, of course, is universally recognized as a crime involving moral turpitude.  <u>See, e.g.,</u> <u>Dashto</u>, 59 F.3d at 699.

However, other decisions determining that crimes involving only a recklessness mens rea were crimes involving moral turpitude  fall far short of this careful search for the defining elements of a "crime involving moral turpitude" found in <u>Campbell</u> and <u>Gutierrez-Chavez</u>.  The deficiencies in the analysis in <u>Wojtkow</u> and <u>Medina</u> have already been demonstrated above, beginning at page - 45 -.  Neither of these cases looked beyond the statutory definition of the state crimes in question, thus pulling out of thin air the BIA's own interpretation of whether the <u>state</u> crime involved the essential elements of a crime involving moral turpitude.  Thus, in <u>Medina</u>, the case upon which <u>Wojtkow</u> relies, the BIA glibly ignored a long string of precedent holding reckless or involuntary conduct not to involve moral turpitude, because of the lack of any intent, by remarking that "willingness to commit the act in disregard of the perceived risk" was sufficient.  <u>Medina</u>, 15 I. & N. Dec. 611.  However, recklessness, defined as "conscious disregard," or "willingness to commit the act," does not equal "evil intent"; otherwise, the law would not distinguish among culpable states of mind, separating intentional acts from the merely reckless, and meting out punishment accordingly.  Nor is a "conscious disregard" of or "gross deviation" from a standard of care necessarily vile, base, or depraved, nor does it raise an inference of implicit evil intent.

Thus, nowhere do I find an adequately reasoned opinion holding

that "recklessness," defined by applicable state court decisions as lacking elements of intent or guilty knowledge, can be a crime involving moral turpitude. The BIA's decision below is not such a decision and does not rely on such decisions. To the extent that the BIA concluded that recklessness, defined only as a "conscious disregard" of harm to another, involved the essential characteristics of a crime involving moral turpitude, I find the BIA's inclusion of criminally reckless conduct within the ambit of the deportation statute, § 241(a)(2)(A), 8 U.S.C. § 1251(a)(2)(A), to be wholly unreasonable.

### F. Missouri's Involuntary Manslaughter Statute

Although it may be possible that "recklessness," properly defined, could define a crime involving moral turpitude, I find the BIA's conclusion that the Missouri recklessness statute provides such a definition is wrong as a matter of law. As I have postulated the standard of review for this issue, the BIA is entitled to no deference whatsoever in its interpretation of Missouri law. That is well, because I find that the BIA made two errors in its interpretation of Missouri law in this case. First, the language of the Missouri recklessness statute does not explicitly state the characteristic elements of a crime involving moral turpitude, nor is the language of the statute amenable to such an interpretation. Furthermore, the BIA looked only at the Missouri statutes defining Ms. Franklin's offense, and not at Missouri case law, which properly defines the nature of the statutory elements of the offense. Had the BIA done so, it would have found that Missouri courts have never interpreted Missouri's involuntary manslaughter statute as involving the essential elements of a "crime involving moral turpitude."[23]

---

[23]As I observed above, at note 13, the question is not whether Missouri courts have ever recognized involuntary manslaughter under the Missouri statute as a crime involving moral turpitude, because to do so would indeed surrender to state determination a matter of federal law. Rather, the question is whether Missouri courts have defined the elements or nature of the crime in such a way that it necessarily involves the essential elements of a "crime involving moral turpitude" under the federal definition of such crimes.

However, I do not believe that a determination by a Missouri court that the state's involuntary manslaughter statute was or was not a crime involving moral turpitude would be unpersuasive in this

Missouri's statutory definition of criminal recklessness at issue here is found in Mo. Rev. Stat. § 562.016.4. That statute

---

case, because Missouri employs the same definition of moral turpitude as does the BIA in attorney disciplinary cases. See, e.g., In re Warren, 888 S.W.2d 334, 335-36 (Mo. 1994) (en banc) (attorney disciplinary case defining moral turpitude as an "act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen or to society in general, contrary to the accepted and customary rule of right and duty between man and man; everything done contrary to justice, honesty, modesty and good morals."); In re Shunk, 847 S.W.2d 789, 791 (Mo. 1993) (en banc) (definition focusing only on acts contrary to justice, honesty, modesty, or good morals, but also noting moral turpitude can be shown by act involving baseness, vileness, or depravity); In re Duncan, 844 S.W.2d 443, 444 (Mo. 1993) (en banc) (attorney disciplinary case finding moral turpitude is defined by the Missouri Supreme Court as "baseness, vileness, or depravity," and conduct "contrary to justice, honesty, modesty, or good morals"); In re Littleton, 719 S.W.2d 772, 775 (Mo. 1986) (en banc) ("Moral turpitude has been defined as 'an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen or to society in general, contrary to the accepted and customary rule of right and duty between man and man; everything done contrary to justice, honesty, modesty and good morals."); In re Frick, 694 S.W.2d 473, 479 (Mo. 1985) (en banc) (same definition); In re Burrus, 258 S.W.2d 625, 626 (Mo. 1953) (en banc) (same definition); In re McNeese, 142 S.W.2d 33, 33-34 (Mo. 1940) (en banc) (same definition); In re Wallace, 19 S.W.2d 625 (Mo. 1929) (en banc) (same definition). So, too, the Missouri courts recognize this definition of moral turpitude as applicable to other circumstances. See, e.g., Kluttz v. State, 813 S.W.2d 315, 316 (Mo. Ct. App. 1991) (doctor attempted to withdraw plea to felony failure to return leased or rented property because he had not been advised that he was pleading guilty to offense of moral turpitude leading to the automatic loss of his medical license; court applied similar definition of crime as one involving "an essential element of fraud, dishonesty, or moral turpitude."); Durham v. State, 571 S.W.2d 673, (Mo. Ct. App. 1978) (although not defining phrase, court held that defendant could be impeached as witness on the basis of conviction for use of the mails in furtherance of a scheme to defraud). However, I find no case in which a Missouri court has considered or found that involuntary manslaughter fits within this definition.

defines a person who has acted with criminal recklessness as one who "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and [the] disregard constitutes a gross deviation from the standard of care [that] a reasonable person would exercise in the situation." Mo. Rev. Stat. § 562.016.4. This statutory language does not define an "evil intent" element of a crime, because, as I observed above, it does not state any kind of intent at all, let alone an intent to do evil. The law distinguishes among culpable states of mind, separating intentional acts from the merely reckless, and meting out punishment accordingly. Neither "conscious disregard" of nor "gross deviation" from a standard of care is necessarily vile, base, or depraved, nor does either raise an inference of implicit evil intent.

Thus, although the language of the statute does not explicitly state the essential elements of a crime involving moral turpitude, the BIA "reads into" the explicit elements some inference or possibility of moral turpitude. Following Medina, 15 I. & N. Dec. 611, the BIA in this case apparently finds sufficient a "willingness to commit the act in disregard of the perceived risk," which is its own interpretation of the meaning of "conscious disregard." I do not find that interpretation supportable, nor, if it were proper, would I find such "willingness" sufficient. Like "readiness to do evil," such a "willingness" to act in disregard of risks does not necessarily imply intent to do evil. "Readiness" and "willingness" to act in a certain way or in disregard of risks is a disposition, but "intent" is the formulation of a purpose. It is "evil intent," not readiness or willingness to have such an intent, in which moral turpitude necessarily inheres. Nor is an inference or possibility of moral turpitude the proper standard. A crime is not a "crime involving moral turpitude" unless it is one in which moral turpitude necessarily inheres. Goldeshtein, 8 F.3d at 647; Chu Kong Yin, 935 F.2d at 1003; Wadman, 329 F.2d at 814; Tseung Chu, 247 F.2d at 935;

-71-

Ablett, 240 F.2d at 625; Giglio, 208 F.2d at 337; Guarino, 107 F.2d at 399.

Thus, it is not necessary to subscribe to my position that review of the BIA's interpretation of Missouri law is de novo, according the BIA no deference, to come to the conclusion that the BIA's interpretation of this Missouri statute cannot stand. Even if I am wrong, and the BIA must be accorded deference in its interpretation of the Missouri statute, the BIA's interpretation simply is not reasonable. Neither "conscious disregard" nor the BIA's gloss on the meaning of that phrase as "willingness to commit an act" can be construed, as a matter of law or as a matter of "reasonableness," to be the requisite "evil intent" element of moral turpitude.

It might be argued that Missouri courts nonetheless recognize elements of moral turpitude in the state's involuntary manslaughter statute.[24] In State v. Hamlett, 756 S.W.2d 197, 200 (Mo. Ct. App. 1988), and State v. Harris, 825 S.W.2d 644, 647-48 (Mo. Ct. App. 1992), the Missouri Court of Appeals held that persons convicted under Mo. Rev. Stat. § 565.024.1(1) have committed an act with "such reckless character as to indicate an utter disregard for human life, and [they have] knowledge, actual or imputed, that [their] conduct would endanger human life." I do not find these

---

[24]The BIA, as I have noted, made no examination of Missouri case law to determine whether the courts have ever interpreted the statutory language in question to include the elements of moral turpitude in the nature of the crime. On appeal, the INS has cited Missouri cases only for the proposition that Missouri recognizes "recklessness" as a "culpable mental state." See State v. Jennings, 887 S.W.2d 752, 755 (Mo. Ct. App. 1994); State v. Pogue, 851 S.W.2d 702, 704 n.3 (Mo. Ct. App. 1993); State v. Hernandez, 815 S.W.2d 67, 72 (Mo. Ct. App. 1991). However, a "culpable mental state" does not necessarily equate with "evil intent" or "guilty knowledge." The majority here has restricted its consideration of Missouri law to the statutory definitions of involuntary manslaughter and criminal recklessness, rather than looking to the interpretations of those statutes by Missouri courts.

cases contrary to the conclusion that involuntary manslaughter under Missouri law is not a crime involving moral turpitude.

In Harris, the Missouri Court of Appeals distinguished between acting recklessly and knowingly under Missouri law on the ground that recklessness "'involves conscious risk creation. It resembles knowingly in that a state of awareness is involved, but the awareness is of risk, that is of a probability less than a substantial certainty. . . .'" Harris, 825 S.W.2d at 647-48 (quoting Model Penal Code § 202 at 236 (1985)). The court observed that where awareness rises to a "practical certainty" and is accompanied by conduct evidencing intent to harm another, the proper charge was second degree murder. Id. at 648. Thus, Harris actually stands for the lack of evil intent or guilty knowledge as an element of involuntary manslaughter under the Missouri statute, not for the presence of such an element.

Similarly, in Hamlett, the Missouri Court of Appeals points out that "recklessness" in Missouri's involuntary manslaughter statute "has the same connotation as the term 'culpable negligence' which appeared in the old manslaughter statute." Hamlett, 756 S.W.2d at 199. It is this definition of "culpable negligence" that was then applied to involuntary manslaughter. Id. However, the Hamlett decision points out that conduct is not "reckless," within the meaning of the new involuntary manslaughter statute, if it was "intentional." Thus, Hamlett also stands for the proposition that involuntary manslaughter under the Missouri statute lacks rather than includes an evil intent or guilty knowledge element.

I have found no Missouri cases finding or suggesting that involuntary manslaughter under the Missouri statute involves the essential elements of a crime involving moral turpitude, but I have found many that suggest that involuntary manslaughter under the Missouri statute lacks precisely the necessary elements. See, e.g., State v. Isom, ___ S.W.2d ___, 1995 WL 493993, *2-3 (Mo. Ct.

App. Aug. 21, 1995) (slip. op.) (quoting same distinction between recklessly and knowingly as in <u>Harris</u>, in the context of involuntary manslaughter conviction, and further finding distinction between involuntary manslaughter and voluntary manslaughter is whether there is "evidence of recklessness as opposed to intentional conduct; "[e]vidence that a defendant intended the act which caused the death, even if he did not intend the result, supports submission of voluntary, not involuntary, manslaughter"; thus conduct that "goes beyond recklessness and constitutes conduct which was likely to produce death" constitutes voluntary manslaughter); <u>State v. Smith</u>, 891 S.W.2d 461, 467 (Mo. Ct. App. 1994) (same distinction between involuntary manslaughter and voluntary manslaughter on the basis of intent); <u>State v. Jennings</u>, 887 S.W.2d 752, 754 (Mo. Ct. App. 1994) (although involuntary manslaughter lacks any element of intent to cause harm, it may still support conviction for armed criminal action); <u>State v. Schmidt</u>, 865 S.W.2d 761, 764 (Mo. Ct. App. 1993) (involuntary manslaughter does not involve elements of acting purposefully or knowingly, but involuntary manslaughter may still support a conviction for armed criminal action); <u>State v. Burke</u>, 809 S.W.2d 391, 397-98 (Mo. Ct. App. 1990) ("consciously disregards" in definition of "recklessness" for the purposes of involuntary manslaughter has its meaning in "common usage," and neither it nor "recklessness" define an intent element); <u>State v. Morris</u>, 784 S.W.2d 815, 820 (Mo. Ct. App. 1990) (intending act, even if not intending result, makes crime voluntary manslaughter); <u>State v. Smith</u>, 747 S.W.2d 678, 680 (Mo. Ct. App. 1988) (intent to do conduct which could lead to death of another goes beyond recklessness); <u>State v. Arellano</u>, 736 S.W.2d 432, 435-36 (Mo. Ct. App. 1987) (one may be reckless if one's conduct is "undirected and random," without intent to harm any particular person or persons); <u>State v. Skinner</u>, 734 S.W.2d 877, 882 (Mo. Ct. App. 1987) (evidence of intent to do the act leading to death, even if death was not intended, negates a finding of recklessness, and makes it inappropriate for court or jury to consider involuntary

manslaughter instead of murder).

The present Missouri manslaughter statute, which distinguishes between voluntary and involuntary manslaughter on the basis of intent, became effective on October 10, 1984, State v. Galbraith, 723 S.W.2d 55, 60 (Mo. Ct. App. 1986), but decisions of Missouri courts ante-dating this amendment of the state's criminal code are nevertheless still instructive on the lack of any intent necessary to support conviction of involuntary manslaughter under Missouri law. See, e.g., State v. Rideau, 650 S.W.2d 675, 676 (Mo. Ct. App. 1983) (former Missouri manslaughter statute, § 565.005, did not make common-law distinction between voluntary and involuntary manslaughter based on presence or lack of intent); State v. Cox, 645 S.W.2d 33, 36 (Mo. Ct. App. 1982) (manslaughter can be committed recklessly, that is, without any intent); State v. Elgin, 391 S.W.2d 341, 345 (Mo. Ct. App. 1965) (even though statute made no distinction, voluntary manslaughter could be distinguished from involuntary manslaughter because the former embraces "an intentional killing," while the latter "extends to an unintentional killing while culpably negligent").

Thus, de novo review of the nature of the crime of involuntary manslaughter under Missouri law demonstrates that the essential elements of a "crime involving moral turpitude" are missing. Even a "reasonableness" review cannot countenance an interpretation of the crime as it is defined under Missouri law as involving such elements. I cannot hold that Myrisia Franklin has been convicted of a crime in which moral turpitude necessarily inheres, and must therefore dissent from the majority's opinion affirming the BIA's conclusion that deportation is appropriate pursuant to § 241(a)(2)(A), 8 U.S.C. § 1251(a)(2)(A), in this case.

## V. CONCLUSION

When the proper standard of review is applied to the issues involved in this appeal, the decision of the BIA should be

reversed.  Although the BIA's definition of a "crime involving moral turpitude" is reasonable, indeed, almost universal, it does not reasonably extend to crimes, such as involuntary manslaughter, involving merely criminal recklessness as a mens rea, at least not where that mens rea is defined as "conscious disregard" of risk to another.

The BIA provides no reasoned basis for its sudden view to the contrary.  Furthermore, a de novo review of Missouri law conclusively demonstrates that the crime of which Myrisia Franklin was convicted has never been defined by Missouri courts as one in which the essential elements of a crime involving moral turpitude necessarily inhere.  By imposing its own interpretation of the language of a Missouri statute, instead of examining how the Missouri courts have interpreted that statute, the BIA committed a fatal error as a matter of law.  The BIA's interpretation so imposed was also wrong as a matter of law, because it was contrary to the interpretation of the statute by Missouri courts.

However, even if one accords the BIA deferential review of its interpretation of Missouri law, as well as deferential review of the entirely federal matter of the meaning of the phrase "crime involving moral turpitude," the BIA's interpretation of Missouri law is not reasonable. Neither the language of the Missouri statute itself nor the gloss put upon it by the BIA can reasonably be construed as stating the requisite elements of a crime involving moral turpitude.

My journey to this conclusion has been long and arduous.  It may not be practicable to expect the BIA to embark upon such an involved analysis in each deportation case.  Indeed, there is no need for the BIA to travel the whole path I have marked, because the BIA would not be concerned with the proper standard of review for its deportation decisions.  That part of the road less traveled is only for the courts entrusted with review of BIA decisions.  However, given the gravity of deportation decisions, justice requires that the BIA travel some of this trail.  The BIA must

undertake a careful analysis of state law in order to determine whether crimes as defined by state statutory law and judicial decisions are crimes in which the essential elements of moral turpitude necessarily inhere. The BIA did not even attempt such an analysis here.

For each of the reasons discussed above, involuntary manslaughter as defined under Missouri law simply is not a "crime involving moral turpitude," subjecting an alien to deportation under § 241(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2)(A). The BIA's strained and tortured notions about the nature of the offense of which Myrisia Franklin was convicted is dramatically at odds with two centuries of this nation's common law and with its own long standing prior rulings. Furthermore, involuntary manslaughter, as it is typically defined, does not include elements characteristic of a "crime involving moral turpitude." Finally, and of most critical importance, Myrisia Franklin's conviction for involuntary manslaughter does not include those characteristic elements as the crime is defined under Missouri law. This being so — I end where I began — the deportation of Myrisia Franklin to the Philippines is, in my view, a miscarriage of justice. I dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.